Barbara STACKS, Appellant,

v.

SOUTHWESTERN BELL YELLOW PAGES, INC., Appellee.

No. 92–1407.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 24, 1993.

Decided June 24, 1994.

Loral Ashton Adcock, Little Rock, AR, argued, for appellant.

Michael S. Moore, Little Rock, AR, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

HENLEY, Senior Circuit Judge.

Barbara Stacks appeals from a judgment entered in the district court in favor of Southwestern Bell Yellow Pages, Inc. ("Yellow Pages") on her claims that she had been harassed and discharged on account of her sex in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). We reverse and remand.

This appeal follows our remand in *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200 (8th Cir.1993) (per curiam), for further findings concerning Stacks' discharge claim. In our previous opinion we did not set forth in detail the facts giving rise to Stacks' claims. We do so now.

Yellow Pages hired Stacks in January 1982 as a sales representative responsible for selling classified advertisements in the telephone directory. Representatives perform their jobs in different cities during a sales campaign called a "canvass." From 1984, Stacks ranked as one of the top revenue producers for Yellow Pages in Arkansas. She received awards and letters of commendation. For example, in January 1986, Dick Brown, the divisional sales manager, wrote Stacks that her "extra effort on the 1986 Little Rock sales canvass has added new meaning to extraordinary" and that her "extra effort and teamwork ... produced ... monthly revenue we could not have produced any other way." Brown further wrote that he was "especially proud of [Stacks] as a *Professional Salesman*." (Emphasis in original.) Stacks' 1986 evaluation stated that she "recognized cus-tomer needs and opportunities" and handled complaints "within the proper time frame."

Beginning in 1986 and continuing until her termination in December 1987, Stacks' immediate supervisor was Virgil Hudson. At trial Hudson admitted that he had stated "women in sales were the worst thing that had happened to this company," but claimed he had made the statement only once and in jest. However, several other Yellow Page employees testified that Hudson had made a similar remark to them. Garner Mitchell, Stacks' supervisor from 1983 until 1985, testified that Hudson told him "the business had gone downhill since the company had started hiring women and blacks" and that Brown had been present when Hudson made the statement. Marilyn Parrish, who worked at Yellow Pages from 1977 until 1984, testified that Hudson often asked her why her husband did not support her and why she was working. Pam Gage, who had worked at Yellow Pages in 1987, testified that Hudson told her that "there isn't a woman alive that can make it with Yellow Pages."

The events which led to Stacks' termination apparently began in the spring of 1987, during the Hot Springs canvass. Hudson became concerned that Stacks had "lost control" of her job. He testified that he had to talk to Stacks "continuously," and when he instructed her to do the job his way she would burst into tears and run to the "powder room." After one such incident, Stacks told Hudson that the job was "too much stress and strain" and wrote him a note stating that she "quit." After talking to Brown, Hudson tore up the note and persuaded Stacks to stay on the job.

The Little Rock canvass followed the Hot Springs canvass and was the biggest and most important canvass in Arkansas. During the Little Rock canvass, Hudson again became concerned with Stacks' performance. He felt that she was falling behind in her accounts and was not getting out of the office early enough. After reviewing Stacks' telephone messages, Hudson also became concerned that Stacks was not returning telephone calls promptly. Hudson consulted with Brown, who decided to suspend Stacks because he "could not tolerate the level of

phone calls not being returned here, the lack of sensitivity, or the insensitive approach to customers." Brown believed a suspension was appropriate because he wanted to get Stacks' "attention." Brown instructed Hudson to contact Stacks' customers and ask them to put any complaints in writing, which several did.

Stacks was notified on Tuesday, September 29, 1987, that she would be suspended for five days beginning Monday, October 5. The last day of the Little Rock canvass was Friday, October 2, and Hudson was still concerned that Stacks would not complete her assignment. On Wednesday, September 30, Hudson met with Stacks to review her outstanding accounts. Stacks testified that she told Hudson that she was concerned that she would not be able to finish her accounts and asked him if she could split them with Don Rhodes, another sales representative. Although Hudson first testified that Stacks had assured him that she could finish her assignments, he later testified that after talking to her he told Rhodes that Stacks was "in trouble here" and needed "help." Hudson testified that he told both Rhodes and Stacks that they could not split accounts, but could "ride" together, if they identified the particular accounts and Rhodes' supervisor approved. A company rule permitted sales representatives to call on accounts together if their supervisors approved. According to Hudson, Rhodes told him that riding together would not get the job done and the only way to do so would be to split accounts. Hudson told Rhodes he would talk to Brown. Hudson testified that Brown would not let Rhodes and Stacks split accounts, but had no objection to Rhodes riding with Stacks on "one or two specified calls."

Hudson then talked to Stacks and told her "it won't work. You have to do your own work.... It's your responsibility. Handle your major accounts." Hudson claimed he never gave his permission for Stacks to ride with Rhodes on any accounts, but later learned she had done so. Hudson also testified that he instructed Stacks to return to his office at 4:00 p.m. on September 30, but that she failed to return.

On Friday, October 2, Stacks called in sick. Hudson telephoned Stacks at home and went to her apartment, but was unable to reach her. Later that morning, Hudson learned that Stacks was actually at a customer's office. He telephoned the customer and spoke with Stacks. He requested her accounts, but Stacks told him they were at her apartment and she would bring them in on Monday, October 5. At the end of the day on Friday, Rhodes delivered several of Stacks' accounts to Hudson. On Monday, Rhodes brought in the remaining accounts. Hudson claimed that many of the accounts were turned in incomplete, but acknowledged that following the close of a canvass a "rework" team finalized accounts.

On Monday, October 12, Stacks returned from her five-day suspension and attended a grievance proceeding concerning the suspension. Brown and Hudson claimed that Stacks did not offer any explanation and did not accept responsibility for her behavior. Following that meeting, Stacks was suspended indefinitely and was terminated on December 2, 1987.

Stacks then filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) and eventually filed this lawsuit alleging, among other things, that Yellow Pages had harassed her by creating a hostile work environment and terminated her on account of her sex in violation of Title VII.

In support of both claims, Stacks attempted to show that Hudson treated her differently than he treated white male sales representatives. Stacks testified that Hudson "humiliated, degraded, and raked her over the coals" in front of her co-workers. She could not understand why Hudson treated her like a "dog" despite her excellent sales results, when he treated males with lesser results better. Because of Hudson's abusive manner, Stacks stated she felt "worthless" and believed she could do nothing right. Dwight Harshaw, a black representative, also testified that Hudson treated him harshly. Stacks and Harshaw complained to Brown about Hudson's behavior and requested a transfer from his team, but Brown refused. Stacks testified that she "quit" during the Hot Springs canvass because quitting was

the only way she knew to make the harassment stop. She also testified that in 1986 she had been hospitalized because of depression and in August 1987 she joined a support group for victims of sexual harassment in the work place.

Stacks also claimed that Yellow Pages disciplined her differently than it did male co-workers. She testified that she knew of no male employee who had been suspended because of failing to return telephone calls or customer complaints. Hudson admitted that there were male representatives who had more complaints than Stacks, but were not disciplined. As to her last week of work, Stacks testified that she met with Hudson on the afternoon of September 30 and that he told her she could ride with Rhodes on her accounts.

Leta Anthony, the union vice president who was present for Stacks' grievance proceeding, also testified that she knew of no other employee who had been suspended or terminated because of failing to return telephone calls or complaints. In preparation for the grievance proceeding and for trial, Anthony had reviewed phone messages of male representatives and in number or substance "did not see any margin of error that made [Stacks] stand out." For example, Stacks had six telephone complaints for the month of August, but David Savage had nine complaints and Garner Mitchell, who was a supervisor at the time, had eight. In addition, she noted that a number of male representatives had telephone messages indicating that numerous calls had not been returned. For example, one message to Mitchell indicated a caller had called five times asking for rates, but that Mitchell had not returned the calls. Another message to Mitchell was from a lawyer who "was very upset that [Mitchell] ha[dn't] gotten back to him." Anthony testified that it was her experience that if a long-term employee developed problems which prevented him from continuing to perform his job, he would be transferred to another position. In fact, Brown testified that Mitchell was transferred from a sales supervisor to a systems control supervisor and emphasized the transfer was not a demotion.

Moreover, Anthony claimed that Stacks' "grievance procedure was different from anything that [she] had ever experienced." Anthony first explained that normally a suspension was preceded by a formal warning. She conceded that the company had relied on a warning Stacks received in 1985, but testified that generally a warning only lasts a year. Moreover, Anthony stated she knew of no employee who had been placed on an indefinite suspension pending an investigation. She also testified that at the proceeding Brown continuously interrupted Stacks, refused to let her answer any questions, and spoke to her in a hostile and demeaning manner. Anthony said she had been present for the grievance of an employee who had been accused of falsifying company documents and that his grievance had not been as "severe" as Stacks' grievance.

In addition, in support of her hostile-work-environment claim, Stacks presented evidence of sexually explicit conduct. She testified about "closed parties," which were parties held in hotel rooms after canvasses. Both representatives and managers attended. Stacks explained that wives were not invited so that the male representatives could bring "dates," who were referred to as "road whores" and were "berated, talked down to, made fun of, and passed around." Stacks testified that these parties made her feel "less than human" and "dirty, like there's something wrong with being a woman," and affected her work environment because she became uncomfortable with her co-workers.

Stacks also testified about a party following a company golf tournament in April 1987. About forty people, including managers from five states, attended the party. At some point, Jim Bransford, who would be promoted to manager in January 1988 on Hudson's recommendation, put on a videotape tape. At first the tape appeared to be a review of the golf tournament. However, in the middle of the tape Bransford was shown in the front seat of an automobile with some other males and two female sales representatives were in the back seat. After the men chanted "show us your tits," the women lifted their blouses and exposed their breasts. Two managers from Arkansas watched the videotape.

Stacks testified that when she saw the videotape she felt like she was in a "male locker room" and "just wanted to crawl under the carpet."

Other female employees testified about sexually offensive comments. Jean Burkes, a seventeen-year Yellow Pages employee, testified that in 1987 she was present when Brown told Stacks a joke about masturbation. Pam Gage testified that at work the male representatives and managers often talked about the "road whores" and "tits and ass." She stated that when Bransford was a manager he had compared her breasts to those of Diana Reagan, another sales representative. Reagan testified that her manager, Robert Walker, told her she looked like a "madam" and would not be promoted unless she had breast reduction surgery. Reagan complained to Brown and asked to be transferred out of Walker's crew. Brown told her to work things out with Walker and made him apologize.

Stacks also presented evidence of conduct that occurred after she was terminated. Zelma Taylor, a sales representative, testified that in April 1991, a female stripper performed at a sales meeting as a birthday present for Bransford. Taylor testified that in addition to Bransford other managers were present, including Brown. During the performance, the stripper put her breasts and buttocks in Bransford's face. Taylor heard Brown comment that the "real show was in the back of the room." When Taylor looked in the back, she saw a female employee "quite aghast and shocked."

Brown testified in Yellow Pages' defense. Brown stated that Stacks was not terminated because of customer complaints, failure to return telephone calls, or sales performance. Brown conceded that Stacks was a top performer and that sales performance was the "bottom line." He also explained that top performers often have more complaints than other representatives because higher sales generate more complaints. Brown claimed that Stacks was terminated because of her actions during the last week of September and that she had refused to take responsibility for them at the grievance proceeding. In particular, Brown claimed that Stacks had

been insubordinate, citing her failure to meet with Hudson on the afternoon of September 30, and that she had ridden with Rhodes despite instructions to the contrary. Brown did not testify that he gave explicit instructions to Stacks, but testified that he believed she had violated his instructions to Hudson. Brown stated he told Hudson "I want Barbara Stacks to handle her own job. She's made this bed, and I want her to take care of it." Brown believed this instruction was "very clear" and meant "not to have somebody ride with you." Brown, however, admitted that he was not privy to Hudson's conversation with Stacks and that it was reasonable that she had asked for assistance. He also acknowledged that he told Rhodes that he could ride with Stacks on one or two accounts, but claimed he later learned that Rhodes' supervisor had not given his permission.

In response to a question from the court whether Rhodes had been disciplined "since he also disobeyed," Brown replied no. Brown explained that he did not believe that Rhodes had disobeyed any specific instruction because Rhodes had not been present when Hudson told Stacks to complete her own work and believed that Stacks had not told Rhodes of Hudson's instruction. The court then asked Brown if he had ever discussed the matter with Rhodes. Brown again replied no.

During cross-examination, Brown was questioned about a "Documentation Outline" concerning Stacks' termination. The outline, which was partly typewritten and partly handwritten, stated, in typewriting, "Customer Complaints—Sole Reason For Termination" and concluded with "Call Barbara Stacks' Clients To get Supporting Letters or Documents." Brown admitted that his handwriting was on the document and that he had written "Concurred with Rec of Sales" following the typewritten query "Termination of Stacks–Your Role." Brown, however, denied ever seeing the document before. Brown also admitted that the investigation of Stacks following her suspension was "indepth" and "unusual." He knew of only two disciplinary investigations as complete as Stacks' investigation and those involved em-

ployees who had been accused of falsifying company documents and contracts. Counsel also asked Brown if the company had options other than termination in dealing with sales representatives who had been good performers but began experiencing problems. Brown responded that the company could give the employee a warning, place him on probation, or enroll him in a "Development Program," which was a formal procedure whereby a manager and an employee were given the opportunity to work out a problem. Brown testified that he had considered recommending the program when Hudson reported that Stacks was having problems in Hot Springs, but did not go forward with it, explaining the ultimate decision rested with Hudson.

As to Hudson's manner, Brown characterized Hudson as "very mannerly" and the "consummate professional," but acknowledged that Hudson was "emotionally honest" and publicly "chewed out" all employees. Brown admitted that Stacks' complaint prompted him to instruct Hudson to criticize his employees behind closed doors. Brown also admitted that he had heard that Hudson had remarked that women and blacks were the worst thing that had happened to the company. Alternatively, Brown stated that he believed that Hudson made the remark "in jest or as points of frustration." Brown explained that he had accepted Hudson's explanation that he was referring to women and blacks "who don't work." Brown, however, considered the remark was "out-of-line" and discussed it with Hudson. Hudson could not recall the discussion.

As to Stacks' other claims, Brown denied making any comment to her about masturbation. Brown, however, admitted that he was present when the stripper performed and had commented on the "show in the back of the room."

In an opinion issued from the bench, the district court acknowledged the case was one of the most difficult discrimination cases it had ever heard. The court stated:

I'll admit that I do have some problems with some of [Hudson's] testimony. I think he may well have thought that women were the worst thing that happened to

Southwestern Bell Yellow Pages and that if he had his druthers, he wouldn't have any women there.... Yes, I have some problems with the way Ms. Stacks' attitude was being evaluated.

Nonetheless, the court rejected Stacks' claims.

As to the hostile-work-environment claim, the court noted that despite its reservations about Hudson's testimony it did not believe that Hudson had harassed Stacks because of her sex. The court believed that Hudson was "unpleasant toward everybody." As to the incidents of sexually explicit conduct, the court disbelieved Stacks' testimony that Brown told her a joke about masturbation. The court, however, apparently believed her testimony concerning the other incidents, but found the incidents could not support a hostile-work-environment claim. The court discounted the videotape incident because it was isolated and there was no showing of company involvement. The court rejected Stacks' testimony that the closed parties made her feel less than human because she had admitted having had a relationship with a married man.

As to her discharge claim, the court noted that it would not have terminated Stacks, characterizing her as a "crackerjack salesperson." However, the court found that Stacks had not proved a Title VII violation because Yellow Pages had articulated a nondiscriminatory reason for the discharge and that Stacks had not shown the reason was pretextual.

Stacks appealed. Although she acknowledged that generally a finding of no discrimination is subject to the clearly erroneous rule, she argued that the district court erred as a matter of law in failing to address the question whether the mixed-motives analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), was applicable. "Under the *Price Waterhouse* test, once an employee has established that gender was a motivating factor in the employment decision, the burden of persuasion shifts to the defendant, which must show that 'it would have made the same decision even if it had not taken [gender] into ac-

count.' " *Stacks,* 996 F.2d at 202 (quoting *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991)).

This court agreed and remanded, instructing the district court to make findings "whether Stacks demonstrated that her gender was *a* motivating factor in the challenged employment decision, and, if so, whether Yellow Pages met its burden to demonstrate it would have made the same decision anyway." *Id.* We noted that evidence that gender was a motivating factor included " 'evidence of actions or remarks of the employer that reflect a discriminatory attitude,' and '[c]omments which demonstrate a discriminatory animus in the decisional process, or those uttered by individuals closely involved in employment decisions....' " *Id.* at 202–03 (quoting *Beshears,* 930 F.2d at 1354). We directed the district court to reconsider its statement concerning Hudson's remarks about women at Yellow Pages and the "way Ms. Stacks' attitude was being evaluated." *Id.*

On remand, the district court again rejected Stacks' claims. The district court stated that the "discharge claim [wa]s dealt with easily under *Price Waterhouse.*" The court reasoned that the case was inapplicable because Brown, not Hudson, was the decisionmaker and there was no credible evidence that Brown was biased against Stacks because she was a woman. The court then went on to apply *Price Waterhouse* to Hudson's treatment of Stacks in the context of her harassment claim. The court found that *Price Waterhouse* was inapplicable because Stacks refused to follow Hudson's instructions and had lied about her whereabouts on the job. Alternatively, the court found that even if there was a gender-based motive in Hudson's treatment of Stacks, Stacks would not prevail because Hudson "would have taken the same action against a man who intentionally disobeyed, frustrated his managerial efforts, and was untruthful."

■ After remand, Stacks first argues that the district court erred in failing to analyze her discharge claim under *Price Waterhouse.* In particular, she argues that as a matter of law and fact the court erred in finding that Brown was the sole relevant decisionmaker as to her discharge. We agree. As made clear in our remand, evidence that gender was a motivating factor includes evidence of "[c]omments which demonstrate a discriminatory animus ... uttered by individuals closely involved in employment decisions." *Id.* (quoting *Beshears,* 930 F.2d at 1354). This court has recently stated that " '[a]n employer cannot escape responsibility for [ ] discrimination ..., when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [women].' *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1057 (8th Cir. 1993) (quoting *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1147 (7th Cir.1993)).

Here, without doubt Hudson was closely involved in the decision-making process at each step. At trial Hudson admitted that he participated in the decisions to suspend and terminate Stacks. "[T]he fact that [Hudson] did not 'pull the trigger' is of little consequence." *Simpson v. Diversitech Gen., Inc.,* 945 F.2d 156, 160 (6th Cir.1991), *cert. dismissed,* ——— U.S. ———, 112 S.Ct. 1072, 117 L.Ed.2d 277 (1992). We need not remand a second time for the district court's reconsideration. Although the court erred in failing to apply *Price Waterhouse* to Stacks' discharge claim, it did apply it to her harassment claim. While, as will be discussed, the court erred in applying *Price Waterhouse* to the harassment claim, its analysis in the context of the harassment claim is applicable to the discharge claim.

■ Despite its earlier concern that Hudson's comments reflected a discriminatory animus that affected the way in which he evaluated Stacks' performance, on remand the court found that Hudson's comments and conduct did not invoke *Price Waterhouse* because Stacks had disobeyed and lied to him. The district court evidently misunderstands the first part of the *Price Waterhouse* mixed-motives analysis. Even if an employee is disobedient or has lied, that "does not render [gender]-based motives against such an employee justified." *Id.* at 160. By focusing on Stacks' behavior the court failed to consider whether she presented "evidence, be it direct or circumstantial, sufficient to support a finding by a reasonable fact finder

that [gender] actually motivated the challenged decision." *Stacks,* 996 F.2d at 201 n. 1. We believe she did.

■ "Not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993). Hudson's comment that "women were the worst thing" that had happened to the company, however, warrants such an inference, even though it was not made during the decisional process. In *Radabaugh,* this court held that corporate documents which emphasized youth as a positive factor and were authored by one of two persons who participated in a decision to discharge an older worker supported the giving of *Price Waterhouse* instruction. The court noted that even though the documents were "not directly relate[d] to the challenged employment decision, ... [t]he emphasis on youth displayed in such documents cannot be assumed to be irrelevant to employment decisions made in part by the documents' author." *Id.* In *Radabaugh,* this court relied on *EEOC v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir.1990), a case very similar to the case at bar. In *Alton Packaging,* the Eleventh Circuit held that a statement by a general manager that "if it were his company, he would not hire blacks" was evidence of a discriminatory animus sufficient to shift the burden to the employer under *Price Waterhouse. Id.* at 924. The court noted that the manager had participated in the denial of a promotion to the black plaintiff and that the statement indicated a "decidedly negative attitude toward black people." *Id.* at 924 n. 6. *See also Brown v. East Miss. Elec. Power Ass'n.,* 989 F.2d 858, 862 (5th Cir.1993) (supervisor's routine use of racial slur sufficient to shift burden under *Price Waterhouse* ); *Beshears v. Asbill,* 930 F.2d at 1354 (president's statement that "older employees have problems adapting to changes and new policies" sufficient to shift burden under *Price Waterhouse* ).

■ Leaving credibility issues aside,[1] we believe Stacks also presented evidence that Brown was motivated by a discriminatory animus. At trial Brown admitted that he was aware that Hudson had stated that women and blacks were the worst thing that had ever happened to the company. Brown, however, attempted to minimize the comment by characterizing it as a joke or by explaining that Hudson was "only" referring to women and blacks who did not work. He later conceded the remark "out-of-line" and claimed he discussed it with Hudson. Apparently, the discussion had little or no effect on Hudson; he did not remember it. In similar circumstances, the Fifth Circuit has held that a manager's response to a supervisor's use of a racial slur was evidence that the manager's decision to fire a black employee was "influenced by racial factors." *Brown v. East Mississippi Elec. Power Ass'n.,* 989 F.2d at 862. In *Brown,* the court noted that a manager had "minimized [a] complaint about [a supervisor's] use of racial slurs" and although the manager "ostensibly reprimanded [the supervisor], [the manager] never considered that [the supervisor's] bla-

1. We are aware that the district court discounted Stacks' credibility and credited Brown's testimony in large part because the court did not believe that Brown told Stacks a joke about masturbation. Although we have some problems with the way in which the court evaluated credibility, we need not disturb this finding. Our holding that Stacks presented sufficient evidence to shift the burden under *Price Waterhouse* is based on undisputed evidence. However, we note that although the court found Brown to be a credible witness, there is documentary evidence which casts doubt on that finding. "Ordinarily, a credibility determination cannot be clear error." *Johnson v. Arkansas State Police,* 10 F.3d 547, 552 (8th Cir.1993). However, "[w]here documentary or objective evidence contradicts witness testimony, an appellate court may reverse even a finding purportedly based on a credibility determination." *Id.* at 553. Here, at trial Brown insisted that Stacks was not terminated because of customer complaints, even though he acknowledged that his handwriting was on a document concerning her termination which stated "Customer Complaint—Sole Reason for Termination." Yet, without explanation, Brown claimed he had never seen the document before trial. *Cf. Briscoe v. Fred's Dollar Store, Inc.,* 24 F.3d 1026, 1027–28 (8th Cir.1994) ("The reasons for the discharge [given] at trial differed substantially from those [ ] advanced at the time of the discharge. This disparity lends support to the court's conclusion that the reasons articulated at trial were mere pretexts for an impermissible reason for termination under Title VII.").

tantly racist attitudes might explain his criticism of [the employee] and might undermine the objectivity of his advice with respect to [the employee's] position with the company." *Id.* at 862–63.

In addition, there is "ample circumstantial evidence in the sequence of events to support the contention that ... demonstrated [gender]-based animus was a substantial motivation" in Stack's suspensions and firing. *Ostrowski v. Atlantic Mut. Ins. Co.,* 968 F.2d 171, 183 (2d Cir.1992). Stacks presented undisputed evidence that she had been treated differently than her male counterparts in the disciplinary actions leading to her termination. *See Johnson v. Arkansas State Police,* 10 F.3d 547, 554 (8th Cir.1993) (evidence that black trooper was suspended without pay, but white troopers were suspended with pay justified *Price Waterhouse* analysis); *Radabaugh,* 997 F.2d at 450 (evidence that younger workers were treated more favorably than older workers justified *Price Waterhouse* instruction). Here, the evidence was that male co-workers had not been suspended because of customer complaints or failure to return telephone calls. In fact, Brown conceded that top performers like Stacks often generated more complaints. In addition, the undisputed evidence was that Stacks' investigation was different from those of male co-workers. Brown admitted that the investigation following Stacks' suspension for failing to return telephone calls was "in-depth" and "unusual," rivaling investigations for employees accused of falsifying company documents. Also, Brown stated that Stacks was denied the opportunity to enroll in a development program, although he had considered the program at the time she began to "lose control."

■ Since Stacks satisfied her burden of proof under *Price Waterhouse,* the burden shifted to Yellow Pages to demonstrate by a preponderance of the evidence that it would have terminated her even if it had not taken gender into account. The district court appeared to believe that the company fulfilled its burden because it would have terminated a male who had behaved as Stacks did after she was notified of the five-day suspension. By focusing on Stacks' behavior after the notification of the suspension, the district

court again has erred. This case is very similar to *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d at 1051. In that case, a personnel committee discharged Kientzy, a female security guard, for violating an unwritten company rule by going home for lunch. McDonnell Douglas argued that it could not be held liable under Title VII because "Kientzy admit[ted] and the magistrate judge found that [the] committee's decision to terminate Kientzy's employment was free from discrimination." *Id.* at 1056. We rejected the argument and refused to " 'sterilize a seemingly objective decision' " because " 'earlier discriminatory decisions' " had led to the firing. *Id.* at 1057 (quoting *Vaughn v. Edel,* 918 F.2d 517, 523 (5th Cir.1990)).

"Look[ing] beyond the moment the decision [to fire Kientzy] was made," *id.,* we found that Kientzy's supervisor had treated her differently than he had treated male guards. Among other things, the supervisor "did not counsel Kientzy as other male employees were counseled"; bypassed customary disciplinary procedures by referring Kientzy to the security investigation department, knowing she could be terminated; and "set Kientzy up to fail [the] investigation and the committee's review by telling [the investigator] that Kientzy had been leaving the facility without permission." *Id.* at 1060. *See also Johnson v. Arkansas State Police,* 10 F.3d at 554 ("issue of whether racial bias contaminated the internal investigation of [plaintiff] is critical to a determination of whether or not the [defendant] acted in a discriminatory manner when it terminated [plaintiff]"); *Shagar v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) (company could not escape liability even if committee's decision to fire older employee was supported by plausible evidence because decision was "tainted" by supervisor's prejudice; supervisor "not only set up [employee] to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying [his] performance to the committee in the worst possible light").

Likewise, in this case, the disciplinary proceedings leading up to Stacks' termination were tainted by gender bias and her alleged misconduct cannot shield the company from liability. Moreover, we believe that Brown set Stacks up to fail by notifying her of the

suspension five days before the end of the Little Rock canvass and then refusing to offer her any assistance in completing her assignments. Even Hudson admitted that Stacks needed help.

■ Even if Stacks' termination had not been the product of tainted disciplinary proceedings, we would have some doubts whether Yellow Pages fulfilled its burden under *Price Waterhouse*. We recognize that Stacks may not have been the perfect employee. However, Title VII "does not protect merely the [female] worker who is perfect from the standpoint of h[er] employer.... It protects, as a practical matter, the imperfect [female] worker from being treated worse than the imperfect" male worker. *Id.* at 403. Much of Brown's testimony concerning the reasons why Stacks was discharged was devoted to explaining his belief that Stacks had been insubordinate by riding with Rhodes.[2] However, Brown conceded that Rhodes was not disciplined or even questioned about his instructions regarding the incident, even though Brown claimed that he had learned that Rhodes' supervisor had not given Rhodes permission to ride with Stacks. *See Kientzy*, 990 F.2d at 1060 (supervisor took an "intense" interest in Kientzy's investigation, but "never followed up or investigated rumors about male employees who had gone home while on duty"); *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d at 863 (black employee discharged because of customer complaint but white employee only given warning); *Jiles v. Ingram*, 944 F.2d 409, 412 (8th Cir.1991) (black firefighter discharged for insubordination but white firefighter not discharged).[3]

2. We note that Brown had difficulty in explaining why Stacks had been insubordinate. He explained that Stacks was insubordinate because she had violated his instruction to Hudson that she was "to handle her own job." Brown thought this instruction was "very clear" and meant she could not ride with Rhodes. Perhaps the instruction was not so clear to Stacks, especially since Hudson earlier told her she could ride with Rhodes and Hudson and Brown told Rhodes he could ride with Stacks.

3. Yellow Pages asks that we take judicial notice of an arbitration decision finding that Stacks had been dismissed for just cause under the collective bargaining agreement. Although we take notice of the decision, we do not defer to it, nor give it

■ Having concluded that Stacks has prevailed on her discharge claim, we now turn to her hostile-work-environment claim, with respect to which she also prevails. In part, the district court analyzed the claim under the *Price Waterhouse* mixed-motives analysis. The mixed-motives analysis is inapplicable to a hostile-work-environment claim. The analysis was designed for a challenge to "an adverse employment decision in which both legitimate and illegitimate considerations played a part." *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788. An employer could never have a legitimate reason for creating a hostile work environment. "Rather, the key issue" in analyzing a hostile-work-environment claim " 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Kopp v. Samaritan Health Systems, Inc.*, 13 F.3d 264, 269 (8th Cir.1993) (quoting *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993)). Moreover, "[t]he predicate acts which support a hostile-environment sexual-harassment claim need not be explicitly sexual in nature." *Id.*[4] "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1014 (8th Cir.1988). Here, Hudson and Brown's discriminatory treatment of Stacks in connection with her disciplinary actions also supports her hostile-work-environment claim.

■ At this juncture, we need not recite in detail the evidence of incidents of a sexual nature. However, we will comment on sever-

any weight. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974).

4. In its oral opinion before remand, the district court erroneously found that Stacks' sexual harassment claim was barred. The court believed that Stacks had not adequately presented it to the EEOC. The court noted that although her EEOC charge alleged harassment, Stacks had not detailed any incidents of a sexual nature. The court, however, expressed some doubt in its reasoning and went on to review the evidence of sexually explicit conduct and "the other type of job harassment to which Ms. Stacks was subject."

al of the district court's findings and conclusions that reflect clear errors of law or fact. The district court discounted Stacks' testimony that the "closed parties" made her feel less than human because Stacks had admitted that she had been seeing a married co-worker. By focusing on Stacks' private life, the court erred as a matter of law. *See Burns v. McGregor Elect. Indus. Inc.,* 989 F.2d 959, 963 n. 4 (8th Cir.1993) ("person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment") (quoting *Katz v. Dole,* 709 F.2d 251, 254 n. 3 (4th Cir.1983)).

 The district court also found that the company could not be held liable for the incident at the party following the golf tournament in which Jim Bransford put on a videotape showing him in a car with bare-breasted female sales representatives. The court found that the incident was isolated and there was no showing of company involvement. We think the court erred on both grounds. In assessing the hostility of an environment, a court must look to the totality of the circumstances. *Burns v. McGregor Elect. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992) (appeal before remand). Just as " '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, ... a discrimination analysis must concentrate not only on individual incidents but on the overall scenario.' " *Id.* (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990)). Here, viewed in the context of the parties following the close of a canvass and a sales meeting where a stripper performs,[5] the videotape incident is not isolated. We also believe there was an adequate showing of company involvement. "Under Title VII, an employer is liable for sexual harassment if the employer 'knew or should have known of the harass-

ment and failed to take proper remedial action.' " *Davis v. Tri–State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992) (quoting *Burns,* 955 F.2d at 564). Here, the undisputed testimony was that managers from several states, including Arkansas, were present for the showing of the tape, but there is no evidence that the company ever reprimanded Bransford or anyone else for the incident. To the contrary, the evidence is that less than a year after this incident, on Hudson's recommendation, Bransford was promoted to manager.

In conclusion, we hold that the district court erred in entering judgment in favor of Yellow Pages on Stacks' Title VII discharge and harassment claims.[6] Accordingly, we reverse the judgment and remand for entry of judgment in favor of Stacks on these claims following such further proceedings with respect to relief as may be consistent with this opinion.

---

5. Even though the incident occurred after Stacks' termination, it is relevant to her hostile-work-environment claim. *See Baggett v. Program Resources, Inc.,* 806 F.2d 178, 182 (8th Cir.1986) (discriminatory conduct after plaintiff's layoff relevant because "nothing to suggest that the practices changed at all").

6. Because of our disposition, we do not directly address Stacks' other allegations of error regarding her sex discrimination claims. However, we

note that Stacks also alleged that Yellow Pages had discriminated against her on account of her association with Rhodes, who is black. The district court recognized the claim was cognizable under Title VII, *see Parr v. Woodmen of World Life Ins. Co.,* 791 F.2d 888, 891 (11th Cir.1986), but found that Stacks failed to present sufficient evidence to support the claim. At this time we are not inclined to say the court erred in so holding.