MICHAEL, Circuit Judge,
dissenting:
I respectfully dissent. A major purpose of Title VII and the ADEA is to outlaw discriminatory employment decisions that are made because of sex or age. Biased subordinates without decisionmaking authority often influence these decisions. Yet the majority holds that when a biased subordinate with no decisionmaking authority exercises substantial influence over an employment decision, the subordinate’s bias cannot be imputed to the formal deci-sionmaker who acts for the employer. See ante at 291. This puts us at odds with virtually every other circuit, and it puts us at odds with the language of the statutes, which impose liability when an adverse employment decision is taken “because of’ sex or age discrimination, see 42 U.S.C. § 2000e — 2(a)(1); 29 U.S.C. § 623(a)(1). After today in this circuit, an employer is off the hook for a discriminatory employment decision that is motivated by the bias of a subordinate who lacks decisionmaking authority. That is wrong. As for the facts in this case, the majority fails to state them in the light most favorable to the plaintiff, Ethel (Lou) Hill, who was the nonmovant in the summary judgment proceedings; it especially fails to draw all justifiable inferences in Hill’s favor. As a result, the majority errs in affirming the award of summary judgment to Lockheed, the employer.
I.
A detailed account of the facts, stated in Hill’s favor, appears in the panel opinion, Hill v. Lockheed Martin Logistics Management, Inc., 314 F.3d 657, 660-62 (4th Cir.2003), vacated by en banc order, February 12, 2003. A somewhat abbreviated version of those facts follows. Lou Hill, who is an experienced sheet metal mechanic, was almost fifty-eight years old *300 when Lockheed sacked her in 1998. By that time Hill had worked her trade in the aircraft industry for nearly twenty-five years, the last eleven with Lockheed. At Lockheed, Hill was assigned to field teams that went to U.S. military bases to do modification work on military airplanes. Hill was working on a Lockheed job at Fort Drum, New York, when she was fired in May 1998. Hill ran into trouble on this job after Edward Fultz became her safety inspector in February 1998. Fultz did not like to have women working under him, and Hill was the only woman (and the oldest employee) on her eight-person crew. Fultz targeted Hill immediately, and during the three months in 1998 when Fultz was Hill’s inspector, he made many derogatory remarks about her sex and age. On several occasions Fultz referred to her as a “useless old lady.” J.A. 240A. One time he said that Hill was a useless old lady who needed to go home and retire. Another time Fultz said that Hill was “useless and they need[ed] to retire her.” J.A. 240B. He also called her a “damn woman,” J.A. 241A, and “a troubled old lady,” J.A. 245. Hill complained several times to her supervisor, Richard Dixon, about Fultz’s harassment, but Dixon did nothing to stop it. Fultz was thus free to act on his bias against Hill by orchestrating disciplinary actions against her that made her eligible for termination. Once Hill’s job was in jeopardy, formal Lockheed decisionmakers fired her based on Fultz’s negative assessment of her work.
Fultz’s first move was to manipulate Dixon into reprimanding Hill for violating Lockheed’s tool control policy. Under this policy an employee must keep track of her tools and report missing tools to her supervisor. Hill had three identical pairs of four-inch cutters, and an Army employee found a pair of Hill’s cutters on a maintenance stand on April 14, 1998. The Army employee took the cutters to Fultz, who then gave them to Dixon. Fultz told Dixon that he had checked Hill’s toolbox at the end of Hill’s shift and asked her where her extra cutters were. According to Fultz, Hill replied, “I told Richard [Dixon] I took [them] home.” J.A. 145. Hill insists that she did not have any discussion with Fultz about her cutters and that Fultz lied to Dixon. Indeed, Hill did not even know that a pair of her cutters were missing, so she had no occasion to claim that she had talked to Dixon about missing cutters. Hill was therefore surprised when Dixon showed her a pair of cutters and asked if they were hers. Believing that all of her cutters were accounted for, Hill simply replied that the cutters had her number on them. This answer did not satisfy Dixon because he mistakenly believed — based on Fultz’s false report — -that Hill already knew for sure that her cutters were missing. Dixon also believed that Hill had lied to Fultz by telling him that she had talked to Dixon about her missing cutters. (Dixon did not tell Hill about Fultz’s report to him, so Hill had no opportunity to point out that Fultz was lying.) Because Fultz’s false report led Dixon to conclude that Hill had lied, Dixon gave Hill a written reprimand and a three-day suspension.
After Hill returned from her three-day suspension at the end of April 1998, she complained again to Dixon that Fultz was discriminating against her. Dixon mentioned to Fultz that Hill had registered a complaint, and Fultz reacted with noticeable anger towards Hill. Fultz immediately began to write discrepancy reports (reports documenting worker error) on Hill, writing six reports in the next three workdays. Fultz marked each of the errors as “minor,” and Hill said they were “nitpicky and trivial.” J.A. 83. Fultz, as safety inspector, had the discretion on whether or not to write up minor mistakes. Dixon, as *301 supervisor, had no control over whether a discrepancy report was written. Dixon could, however, check a report for accuracy, and he refused to endorse one of the reports that Fultz issued against Hill. Dixon said that Hill’s minor work errors during her tenure at Ft. Drum were never serious enough for him to engage in formal counseling with her.
Nevertheless, Hill was handed another written reprimand on May 4, 1998, as a result of the flurry of discrepancy reports Fultz had issued against her during the three workdays at the end of April and the beginning of May 1998. This last reprimand was Hill’s third in twelve months (one had carried over from another job), and she was now subject to discharge. Within days she was fired. The formal decision to fire Hill was made by two Lockheed officials, Archie Griffin and Thomas Prickett, neither of whom was located at Fort Drum. According to Griffin, the decision to fire Hill was based entirely on information provided by Fultz and Dixon, especially Fultz. Griffin talked with Fultz about Hill several times prior to the termination decision, and Fultz provided Griffin with a written statement of his observations about Hill’s work performance. Neither Griffin nor Prickett talked with Hill while she was being considered for termination, and neither official had any firsthand knowledge of her work at Fort Drum. (It was a violation of Lockheed policy not to give Hill the opportunity to present her side of the story before she was fired.) Dixon, Hill’s supervisor, did not make any recommendation to Griffin or Prickett about whether Hill should be fired. On the other hand, Griffin and Prickett relied on Fultz to write and sign Hill’s termination statement, a document explaining that Hill was fired because Fultz found her work to be unsatisfactory. After Hill was fired, her work was initially assigned to a thirty-one-year-old man, and she was ultimately replaced by a man who was forty-seven.
II.
The majority renders Title VII and the ADEA essentially toothless when it comes to protecting employees against unlawful employment decisions that are motivated by biased subordinates. The majority holds that an “employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with [proof] that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the [adverse] decision or the actual decision-maker for the employer.” Ante at 291 (emphasis added). This proof makes the employer liable, the majority says, because such a subordinate “act[s] in a supervisory or managerial capacity as the agent[ ] of the employer.” Ante at 289. “It is [this] individual ],” the majority emphasizes, “who must possess the requisite discriminatory motivation behind the adverse employment decision that [he] make[s] or for which [he] hold[s] principal responsibility.” Ante at 289. This holding is unduly narrow. It authorizes discriminatory employment decisions that are motivated by biased subordinates who do not act in a supervisory or managerial capacity. The majority goes astray, I respectfully suggest, because it bases its holding on principles of agency law that do not get to the real issue in this case, and it overlooks the statutory focus on causation, that is, whether an adverse employment action was taken “because of’ a protected trait such as sex or age. Moreover, the majority’s restrictive approach for determining whether a subordinate’s discrimination should be counted is out of step with the law in other circuits, and it lacks support from the Supreme Court.
*302 The majority argues that Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), dictates the principle that an employer cannot be held vicariously liable for an employment decision motivated by a biased subordinate unless the subordinate “act[s] in a supervisory or managerial capacity as the agent[] of the employer.” Ante at 289. Ellerth does not dictate any such rule. Ellerth is bottomed on the unremarkable fact that corporations and other institutional employers act through agents. The decision recognizes that the agency relationship triggers vicarious liability for the employer when its supervisor, or some other person acting with authority, takes a tangible employment action (discharge, for example) against an employee. Ellerth, 524 U.S. at 760-62, 118 S.Ct. 2257. The agency relationship extends liability to the employer even when the supervisor or other agent takes tangible employment action for discriminatory reasons. Id. As Judge Posner puts it in Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir.1990): “a supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and [doing it with] wrongful intent ... does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer.” The Supreme Court in Ellerth sums it up in about the same way: “When a supervisor makes a tangible [and adverse] employment decision, there is assurance that the injury could not have been inflicted absent the agency relation.” Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633. Ellerth simply tells us that when a supervisor or other decisionmaker fires an employee for whatever reason, we automatically have an agent whose personnel action is imputed to the employer. That does not answer today’s question: when a biased subordinate who lacks decisionmaking authority substantially influences an employment decision, may his bias be imputed to the formal decisionmaker who acts for the employer. I would hold that it can be.
The basis for imputing the influential subordinate’s discriminatory motive to the formal decisionmaker is rooted in the words of Title VII and the ADEA. The statutes make it unlawful “for an employer ... to discharge ... or otherwise to discriminate against any individual ... because of such individual’s” sex or age. 42 U.S.C. § 2000e-2(a)(l) (outlawing sex discrimination in employment); 29 U.S.C. § 623(a)(1) (outlawing age discrimination in employment). The statutes hinge employer liability on causation, that is, whether the adverse employment action was taken “because of’ sex or age. When the sex- or age-based bias of the subordinate has a substantial or determinative influence on a formal decisionmaker’s adverse employment action, the causation (or liability) requirement is satisfied. The employer is liable for the discriminatory action because the subordinate’s bias is imputed to the formal decisionmaker who acted for the employer. This approach has had support in the circuits for a long time.
The leading case for this approach is Shager v. Upjohn Co., 913 F.2d 398 (7th Cir.1990) (Posner, J.). The Shager plaintiff, a fifty-year-old seed salesman, claimed that he was fired in violation of the ADEA because his supervisor was hostile to older workers. The supervisor did not personally fire the plaintiff; rather, a committee, unbiased and unaware of the supervisor’s prejudice, fired the plaintiff on the recommendation of the supervisor. In analyzing whether the supervisor’s motives could be imputed to the employer, the court looked to whether “the committee’s decision to fire [the plaintiff] was tainted by [the supervisor’s] prejudice.” Id. at 405. The record established that the supervisor “not only set up [the plaintiff] to fail by assign *303 ing him an unpromising [sales] territory but influenced the committee’s deliberations by portraying [the plaintiffs] performance to the committee in the worst possible light.” Id. at 405. Because the committee “acted as the conduit of [the supervisor’s] prejudice,” his prejudice could be imputed to the employer for liability purposes. Id. A later Seventh Circuit case, Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394 (7th Cir.1997) (Posner, J.), likewise discussed what happens in a Title VII case when “the discriminatory motive of [a subordinate employee], not the autonomous judgment of the non-discriminating decisionmaker, is the real cause of the adverse employment action.” Id. at 1400 (emphasis added). The answer is clear: “the prejudices of [the subordinate] are imputed to the employee who has formal authority over the plaintiffs job.” Id. The Shager and Wallace opinions were nevertheless careful to point out that the subordinate’s bias will not be imputed to a formal decisionmaker who acts for reasons that are untainted by discrimination. See Shager, 913 F.2d at 405; Wallace, 103 F.3d at 1400.
Most other circuits, in either mixed-motive or pretext cases, have held that when the discriminatory bias of a subordinate influences an employment decision, the employer will be charged with the subordinate’s bias. See, e.g., Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1312 (D.C.Cir.1998) (“[E]vidence of a subordinate’s bias is relevant where the ultimate decision maker is not insulated from the subordinate’s influence.”); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir.2000) (“One method [of proving pretext] is to show that discriminatory comments were made by ... those in a position to influence the decisionmaker.”); Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir.2001) (discriminatory comments of plaintiffs supervisor, who did not have formal firing authority but who “had enormous influence in the decision-making process,” constitute direct evidence of discrimination); Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 286 (3d Cir.2001) (internal quotations and citation omitted) (“Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate ... [because] an evaluation at any level, if based on discrimination, [may] influence[] the decisionmaking process and thus allow[] discrimination to infect the ultimate decision.”); Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir.2000) (“If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker ... it is proper to impute their discriminatory attitudes to the formal decisionmaker.”); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir.1998) (“[R]emarks by those who did not independently have the authority ... to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant.”); Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1323 (8th Cir.1994) (internal quotation marks omitted) (discriminatory remarks of a manager, who was the fired plaintiffs supervisor and who was “closely involved in employment decisions,” constitute direct evidence of discrimination); Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1141 (9th Cir.2001) (manager’s comment was direct evidence of retaliation because “[e]ven if [the] manager was not the ultimate deci-sionmaker [in denying the plaintiff a promotion], that manager’s retaliatory motive may be imputed to the company if the *304 manager was involved in the ... decision”).
Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), an ADEA pretext case cited by the majority, supports the approach of imputing to the employer the biased motives of a subordinate who substantially influences an employment decision. The Supreme Court in Reeves begins by focusing on the importance of causation in employment discrimination cases: “liability depends on whether the protected trait (under the ADEA, age) ... actually playeda role in [the employer’s decisionmaking] process and had a determinative influence on the [adverse decision].” 530 U.S. at 141, 120 S.Ct. 2097 (quotation marks and citations omitted; first alteration in original). Reeves thus assumes that the formal employment decision will be made by someone in authority, that is, an agent of the employer. What matters for liability purposes is whether bias against a protected trait— including bias from a subordinate — had a “determinative influence” on the decision. See id.
The majority is frank in explaining that its holding removes an entire class of discrimination cases from the protection of Title VII and the ADEA. It rejects the approach of a number of other circuits by refusing to “embrac[e] a test that would impute the discriminatory motivations of subordinate employees having no decision-making authority to the employer ... simply because they have influence or even substantial influence in effecting a challenged decision.” Ante at 290-91. By only counting the discriminatory motivation of someone who “act[s] in a supervisory or managerial capacity as the agent[ ] of the employer,” ante at 289, the majority improperly narrows the scope of Title VII and the ADEA. Under the majority’s standard, unlawful discrimination will go unaddressed in many cases where a subordinate’s discriminatory bias taints the employment decision. To prevent this from happening, our circuit should hold that when a biased subordinate has substantial influence on an employment decision, the subordinate’s bias will be imputed to the formal decisionmaker. This, of course, means that the subordinate’s bias should not be imputed if the formal deci-sionmaker conducts an independent investigation and exercises independent judgment that is free of discrimination.
III.
The summary judgment record, taken in the light most favorable to Hill, establishes the following. Fultz, Lockheed’s safety inspector at Ft. Drum, regularly made discriminatory comments on the job about Hill’s sex and age, calling her a “useless old lady” whom the company “need[ed] to retire.” J.A. 240A, 240B. Fultz’s discriminatory attitude was also reflected in actions that Fultz took or orchestrated against Hill. Fultz’s discriminatory animus towards Hill may be imputed to Griffin and Prickett, the two formal decisionmak-ers (or company agents), because Fultz had a substantial influence on the decision to fire Hill.
To begin with, Fultz, as safety inspector, had considerable say in the evaluation of Hill’s performance. Fultz inspected all of Hill’s work, and Fultz alone had the authority to issue discrepancy reports that documented worker error. Using his position, Fultz took a series of steps that set up Hill to be fired. First, Fultz manipulated Hill’s supervisor, Dixon, into believing that Hill had lied about her missing cutters. This led Dixon to issue the second reprimand (with a three-day suspension) to Hill. Second, when Hill returned to work from her suspension, she complained *305 to Dixon that Fultz was discriminating against her. Fultz became quite angry when he learned of Hill’s complaint, and he wasted no time in taking it out on her. Fultz quickly issued six discrepancy reports against Hill, all for minor or trivial mistakes. These discrepancy reports led to Hill’s third reprimand, and the three reprimands made Hill eligible for discharge. Third, once discharge was under consideration, Fultz provided Griffin with a written statement that detailed Fultz’s observations about Hill’s work performance. Fultz portrayed Hill’s performance in the worst possible light, and Hill was fired in due course.
Griffin and Prickett, the formal decision-makers for Lockheed, did not exercise independent judgment in making the termination decision. Griffin and Prickett, who were not located at Ft. Drum, did not observe Hill’s work, nor did they give her the chance to state her case against discharge. They relied entirely on information provided by Fultz and Dixon, but especially Fultz. Dixon simply submitted Hill’s file without a recommendation. Griffin talked with Fultz several times pri- or to the termination decision, and in the end, Griffin and Prickett relied on Fultz to write and sign Hill’s termination statement. The termination statement explained that Hill was being fired because Fultz found her performance to be unsatisfactory. Fultz mainly relied on the grounds for the reprimands that he had orchestrated against Hill. The summary judgment record allows the inference that Fultz orchestrated those reprimands because of his animus towards Hill. Because Griffin and Prickett relied on tainted information from Fultz in reaching the decision to fire Hill, Fultz’s discriminatory animus may be imputed to them. (The record also provides ample grounds for labeling Fultz as an actual decisionmaker, which is an alternative basis for imputing his discrimination to the company. See part II.A.2.C of the vacated panel opinion, Hill v. Lockheed, Martin Logistics Management, Inc., 314 F.3d at 671-73. I do not press this point today, however.)
IV.
The vacated panel opinion (parts II.B, II.C, and III) considers each of Hill’s claims under Title VII and the ADEA— that she was fired because of her sex and age and that she was also fired because of her complaints of discrimination. For the reasons stated in the panel opinion, Lockheed’s motion for summary judgment on these claims should be denied. See Hill v. Lockheed Martin Logistics Management, Inc., 314 F.3d at 673-80. Hill’s evidence entitles her to a trial, and we ought to give her one.
Judge MOTZ, Judge KING, and Judge GREGORY join in this dissent.