# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2548

_____

Abir Qamhiyah,      *

     *

         Appellant,      *

     *    Appeal from the United States

      v.      *    District Court for the

     *    Southern District of Iowa.

Iowa State University of Science      *

and Technology; Iowa Board of      *

Regents,      *

     *

         Appellees.      *

_____

Submitted: December 19, 2008
Filed: June 1, 2009

_____

Before MELLOY, COLLOTON, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Dr. Abir Qamhiyah appeals the district court's[1] adverse grant of summary judgment dismissing her employment-discrimination claims against Iowa State University of Science and Technology ("ISU") and the Iowa Board of Regents (the "Board of Regents"). We affirm.

_____

[1] The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa, sitting by the parties' consent. See 28 U.S.C. § 636(c)(1).

## I.

"We recite the facts in the light most favorable to [Qamhiyah], as the nonmoving part[y]." O'Brien v. Dep't of Agric., 532 F.3d 805, 808 (8th Cir. 2008).

### A.     Background

Qamhiyah is a Palestinian woman who was born in Kuwait.  She practices Islam.  ISU hired Qamhiyah in 1996 as a full-time, non-tenured Assistant Professor in the Mechanical Engineering Department (the "ME Department") of the College of Engineering.  Her Position Responsibility Statement, in relevant part, provided:

> Your responsibilities will include teaching undergraduate and graduate courses in Mechanical Engineering, supervising graduate and undergraduate student research, and continuing your own professional development. . . . We expect you to develop a research program seeking outside funding of your research efforts to carry out the research itself and to support the graduate students working with you.  The most important outcome of your scholarly endeavors will be graduates and refereed publications, meeting presentations, patents, and perhaps texts.  This scholarship should contribute to the national and international prestige and visibility of you and the department in the field of mechanical engineering.

As outlined in the ISU Faculty Handbook, full-time, non-tenured professors at ISU ordinarily serve seven-year probationary periods before ISU considers them for promotion and tenure.  This time period is to allow non-tenured professors an opportunity to demonstrate their qualifications for promotion.  ISU allows non-tenured professors to extend their probationary periods in certain circumstances, including the birth of children.  ISU's extension policy provides that "[s]tandards regarding what constitutes a record deserving of tenure shall not be raised to adjust for any granted extension."

Non-tenured faculty members typically apply for promotion and tenure in their sixth probationary year. The tenure-review process at ISU is multi-faceted, involving reviews at the department, college, and university levels. During a candidate's tenure review, multiple committees and administrators make recommendations regarding a candidate's promotion. The Board of Regents,[2] however, makes the ultimate decision as to whether to promote a candidate.

B.      Qamhiyah's Probationary Period

Qamhiyah alleges that when she began working at ISU in 1996, Indian members of the ME Department immediately began discriminating against her based on her national origin and religion. Specifically, she claims these professors made discriminatory remarks to her and refused to support her research, mentor her, or work with her. Qamhiyah also contends that other, non-Indian members of the ME Department discriminated against her because of her gender and her pregnancies while at ISU.

Because Qamhiyah was a non-tenured professor, the ME Department Chair conducted annual evaluations of her. These evaluations considered Qamhiyah's performance as well as her potential for promotion. An intra-department Promotion and Tenure Screening Committee (the "Screening Committee") also periodically reviewed Qamhiyah's progress.

The first annual evaluation Qamhiyah received was a 1997 evaluation by Dr. Warren DeVries, the then-ME Department Chair. In his written evaluation, which he provided to Qamhiyah, DeVries stated that Qamhiyah was "making good progress"

_____

[2] The Iowa Board of Regents is composed of nine citizen volunteers appointed by the governor of Iowa. Its responsibilities include oversight of the state universities in Iowa.

as a professor, and he complimented Qamhiyah for her positive student ratings as an instructor. DeVries emphasized, however, that Qamhiyah needed to publish more. He also observed that, because Qamhiyah was due to give birth to her first child in 1998, it would be a challenge for Qamhiyah to satisfy ISU's tenure requirements. Nonetheless, he stated that Qamhiyah "seem[ed] to thrive on challenges" and was "an important and valued part of the mechanical systems activity in Mechanical Engineering and the College."

In his 1998 and 1999 written evaluations of Qamhiyah, DeVries made similar positive comments regarding Qamhiyah's teaching. In 1998, however, DeVries told Qamhiyah that her external financial support was "below average" and that she needed to "put effort" into her publishing and training of graduate students. In 1999, DeVries similarly stated that Qamhiyah's "program of scholarship, particularly publications in print and external support for graduate students to sustain [her] scholarly activities really need[ed] a boost to get [her] on track for promotion and tenure." DeVries told Qamhiyah that her external financial support, which he referred to as the "coin of the realm," remained "below average." He therefore warned Qamhiyah that if asked if Qamhiyah could sustain her research, he would answer "no." These observations were consistent with the Screening Committee's findings from 1999 that Qamhiyah had a good teaching reputation but needed to increase her external funding, graduate student training, and journal publications.

In October 2000, Qamhiyah requested a one-year extension of her probationary period for the birth of her second child.[3] DeVries supported Qamhiyah's request, and ISU granted her an extension. Thereafter, in his written evaluation of Qamhiyah's 2000 performance, DeVries stated, "With a reduced load in the Spring 2001 semester for parental leave, and an extra year to prepare your case for promotion and tenure,

---

[3] According to the record, Qamhiyah had not requested an extension for the birth of her first child.

you will need to continue to focus on scholarly output and external support for your research program." He observed that Qamhiyah had "poor output" from her graduate students and was failing to publish "up to [her] intellectual capacity." He stated that Qamhiyah's "overall progress toward promotion and tenure [was] fair to average."

DeVries's final year as the ME Department Chair was 2001. Devries stated in his evaluation of Qamhiyah for that year that Qamhiyah had "made progress" in her scholarship but that her publishing record remained "below average." He also told Qamhiyah that her external support was "a weakness in [her] portfolio [that would] be a challenge to overcome." He stated that Qamhiyah's promotion and tenure case was "not very strong." That year, the Screening Committee similarly found that Qamhiyah had "significant shortfalls in her academic record," including weaknesses in publishing and fundraising.

In 2002, Dr. Jon Van Gerpen became the interim ME Department Chair. In his 2002 evaluation of Qamhiyah, Van Gerpen relayed that year's Screening Committee findings that Qamhiyah's "grants and refereed publications [were] weak" and that she would likely have problems succeeding if she were up for tenure. Van Gerpen noted that the Screening Committee likely had not considered some funds that Qamhiyah had recently procured, but Qamhiyah agreed that she needed to raise more funding. Van Gerpen concluded his evaluation by stating that Qamhiyah's scholarly focus on patents and inventions "was unusual and presented some risk [for her tenure prospects] if [those] items were not viewed as substitutes for the more traditional publications and grants."

In August 2002, Qamhiyah requested a second year-long extension of her probationary period for the birth of her third child. Van Gerpen supported Qamhiyah's request, and ISU subsequently granted it.

C.    Qamhiyah's Tenure Review

In 2003, Dr. Judy Vance became the ME Department Chair. Because 2003 was Qamhiyah's sixth probationary year (excluding her two extensions), Qamhiyah applied for promotion and tenure that fall. As stated above, ISU policy required department, college, and university reviews of Qamhiyah's application before it proceeded to the Board of Regents for a final decision.

1.    Qamhiyah's ME Department Review

Qamhiyah's ME Department review required evaluations from a Promotion and Tenure Review Committee (the "Review Committee"), the voting members of the ME Department faculty, and the ME Department Chair. The Review Committee, which was the first committee to evaluate Qamhiyah's application, consisted of three ME Department faculty members. Its charge was "to perform an in-depth investigation of [Qamhiyah's] qualifications" and to present a recommendation to the voting faculty members of the ME Department. ME Department policy provided that the ME Department Chair, Vance, was to select two Review Committee members and that Qamhiyah had the option of selecting one member.

Qamhiyah requested that Dr. Donald Flugrad be on the Review Committee. Flugrad was not a full professor, but he was Qamhiyah's mentor. Vance asked Flugrad to join the Review Committee and serve as its chair. Flugrad agreed to join the Review Committee, but he declined to chair it. He stated that he believed a full professor needed to be the chair. Vance agreed. Vance then appointed Dr. James Oliver as the Review Committee's second member. Oliver was not a full professor, but he had recruited Qamhiyah to ISU, had done some work with Qamhiyah, and was the member of the ME Department whose work most closely aligned with Qamhiyah's.

As to the third member, Qamhiyah told Vance that she did not want two Indian professors, Drs. Pal Molian and Shyam Bahdur, on the Review Committee. Vance and Qamhiyah therefore discussed two other candidates: DeVries, the former ME Department Chair, and Dr. Abhijit Chandra, another Indian professor. Qamhiyah informed Vance that she preferred DeVries and did not want Chandra on the Review Committee. Vance agreed to ask DeVries and told Qamhiyah that if DeVries declined she would further discuss the appointment with Qamhiyah.

DeVries subsequently declined Vance's request to be on the Review Committee. Vance, without speaking to Qamhiyah, then asked Chandra to chair it. Qamhiyah later told Vance that Chandra's appointment was "fine." Qamhiyah, however, complained to Flugrad about Chandra's appointment and now states that she only agreed to it because she did not want Chandra to know that she opposed him.

The Review Committee met with Qamhiyah, collected and examined Qamhiyah's application materials, and solicited five external opinion letters from faculty members of other engineering schools.[4] The members then evaluated Qamhiyah's credentials and attempted to agree on a recommendation for Qamhiyah's promotion. Flugrad and Oliver ultimately supported Qamhiyah's promotion, but Chandra opposed it. Because the Review Committee members could not agree, Vance allowed the Review Committee to prepare two proposals to present to the voting faculty members of the ME Department. Allowing a minority report was unprecedented.

In December 2003, the voting members of the ME Department faculty met to vote on a recommendation for Qamhiyah's promotion. They reviewed Qamhiyah's

---

[4] The external reviewers evaluated Qamhiyah's credentials for tenure and wrote letters containing recommendations regarding her promotion. According to the record, Qamhiyah nominated three external evaluators, and the Review Committee nominated two.

application materials and heard the Review Committee's reports. Flugrad presented the majority report and Chandra presented the minority report. Vance chaired the meeting, and Chandra interrupted Flugrad's presentation on multiple occasions. At the meeting's conclusion, the faculty members voted sixteen to three to recommend against promoting Qamhiyah. One faculty member later complained, however, about the conduct and fairness of the meeting.

Following the ME Department's faculty vote, Vance relayed the results of the prior votes to Dr. James Melsa, the Dean of the College of Engineering. As the ME Department Chair, Vance also submitted her own recommendation against Qamhiyah's promotion. Vance told Melsa that Qamhiyah had failed in her time at ISU to sufficiently impact the national engineering community, obtain sufficient funding, and establish a sufficient research program. Vance noted, however, that Qamhiyah had potential for future achievement as an entrepreneur, an acceptable publishing record, and commendable abilities as a teacher. Contrary to ISU policy, however, Vance did not provide Qamhiyah with a written explanation for the ME Department's and her votes.

2.     Qamhiyah's College of Engineering Review

Qamhiyah's application proceeded to the broader College of Engineering for review. This review involved evaluations by the Department Chairs Committee on Promotion and Tenure for the College of Engineering (the "Chairs Committee"), the College of Engineering Promotion and Tenure Committee (the "College Committee"), and the Dean of the College of Engineering.

On January 13, 2004, the Chairs Committee, which included Vance, met to review Qamhiyah's case. It voted seven to one to recommend against Qamhiyah's promotion, citing Qamhiyah's low publishing and fundraising numbers as well as her lack of graduate students. It also observed that Qamhiyah had a poor research record,

weak external opinion letters, and negative recommendations from Vance and the ME Department faculty.

The College Committee then met on January 16, 2004, to vote on a recommendation. It voted eight to zero to recommend against Qamhiyah's promotion. Similar to the Chairs Committee, the College Committee cited Qamhiyah's lack of scholarship and "lack of any established research program and funding" as reasons for its vote. It also observed that Qamhiyah's case had received strong opposition within the ME Department. One member of the College Committee later stated, however, that members of the ME Department "heavily lobbied" her to vote against Qamhiyah during this vote, causing her to "cave" to the pressure and vote against Qamhiyah's promotion.

On January 30, 2004, Dean Melsa submitted the College of Engineering's recommendations to Provost Benjamin Allen, which included Melsa's own recommendation against Qamhiyah's promotion. Melsa stated that "Qamhiyah's professional record of achievements [was] not strong enough . . . to justify promotion." Melsa also stated that Qamhiyah had failed to establish a strong research program with national impact, did not possess a professional record sufficient to satisfy the criteria for tenure, and had not demonstrated an ability to compete for sustained funding. He concluded by observing, "The course my colleagues and I have set for the College of Engineering demands very high standards which were unfortunately not met in [Qamhiyah's] case."

3.    Qamhiyah's University Review

Following the College of Engineering reviews, Qamhiyah's case proceeded to the university level for reviews by the Provost and the ISU President. On March 9, 2004, Provost Allen reported to Qamhiyah that he had reviewed Qamhiyah's application and concurred with the negative recommendations at the college level.

Allen specifically stated that Qamhiyah's "scholarship of research, teaching, and professional practice" did not meet ISU's standards for tenure. Allen offered to discuss his decision with Qamhiyah, and on April 5, 2004, Allen met with Qamhiyah to allow Qamhiyah to voice her concerns. Following that meeting, Allen again reviewed Qamhiyah's file, "pay[ing] special attention to the issues [Qamhiyah] raised." He concluded, however, that his "original decision . . . should stand." According to the record, Qamhiyah then appealed her case before it received further review by the ISU President.

### D. Qamhiyah's Administrative Appeal

On May 20, 2004, Qamhiyah appealed her promotion and tenure case to the Faculty Senate Committee on Judiciary and Appeals (the "Appeals Committee"). Qamhiyah claimed that multiple committees had used improper procedures and arbitrary criteria when considering whether to recommend her promotion. She also asserted that discrimination and flaws in the lower-level voting processes had percolated upward to taint later votes.

The Appeals Committee appointed a three-member Ad Hoc Committee of non–College of Engineering faculty to investigate Qamhiyah's claims. The Ad Hoc Committee received written statements, reviewed materials that Qamhiyah had submitted, and interviewed Qamhiyah and thirteen witnesses, many of whom at Qamhiyah's request. The Ad Hoc Committee then reported to the Appeals Committee that it "did not find evidence to support the claims of Qamhiyah's . . . appeal case and recommend[ed] that her appeal be denied." The Appeals Committee then met to consider the Ad Hoc Committee's report. It voted six to three, with one abstention, to affirm the Ad Hoc Committee's recommendation.

On November 15, 2004, the Appeals Committee Chair, Dr. William S. Robinson, wrote to Provost Allen informing him of the Appeals Committee's

-10-

recommendation. Robinson speculated in his letter that the minority voters at the Appeals Committee meeting had been concerned "that the departmental vote [on Qamhiyah's promotion] may unfortunately have been affected to some degree by frictions that arose from inappropriate grounds having to do with cultural differences and gender." Indeed, one member of the Appeals Committee had stated her belief that the ME Department's vote had been "a vote of hate" and that Qamhiyah's case had been tainted by unethical tampering and conflicts of interest. Robinson concluded, however, "that it [was] probable that the [Appeals Committee's] majority position . . . was based largely on the judgment that there were legitimate and real grounds in the record that were sufficient to explain a negative vote by members of [the ME Department]."

After Allen received Robinson's letter, Allen allowed Qamhiyah to respond. Allen then evaluated the Appeals Committee's recommendation and Qamhiyah's response, found no basis to disagree with the Appeals Committee, and recommended to President Geoffroy that Qamhiyah's appeal be denied. On February 14, 2005, President Geoffrey wrote to Qamhiyah and stated that he agreed with Allen's recommendation to deny her appeal. He stated that he concurred with the Ad Hoc Committee's conclusion that "Qamhiyah's tenure case was 'openly, thoroughly and fairly evaluated.'"

Qamhiyah appealed her claim to the Board of Regents. The Board of Regents considered Qamhiyah's appeal and, on June 13, 2005, passed a motion to remand Qamhiyah's case because Vance, the ME Department Chair, had procedurally erred by failing to apprise Qamhiyah in writing of the reasons for the ME Department's and Vance's negative recommendations. It denied Qamhiyah's appeal, however, "in all other regards."

E.    Qamhiyah's Tenure Review on Remand

Upon remand, ISU returned Qamhiyah's case to the point where Vance should have apprised Qamhiyah in writing of the reasons for the ME Department's and her negative recommendations.  Vance then sent Qamhiyah a letter explaining why the ME Department and she had recommended against Qamhiyah promotion.  Vance stated that, among other reasons, Qamhiyah had not raised sufficient funds to support her research or demonstrated "scholarly achievements of the level expected for promotion."  Qamhiyah wrote a detailed letter in response, which ISU added to Qamhiyah's tenure portfolio.  Qamhiyah's case then returned to the College of Engineering for review.

1.    Qamhiyah's College of Engineering Review on Remand

On August 15, 2005, the Chairs Committee met again to reconsider Qamhiyah's case and voted seven to zero to recommend against Qamhiyah's promotion.  It observed that Qamhiyah's case was marginal and faced strong opposition in the ME Department.  It also stated that Qamhiyah had "too few publications," "minimal" funding, and unfocused research.

On August 26, 2005, the College Committee also met again to consider Qamhiyah's case and voted eight to zero to recommend against Qamhiyah's promotion. Like the Chairs Committee, the College Committee stated that Qamhiyah lacked journal articles and funding.  It also observed that Qamhiyah's external opinion letters were "rather luke-warm" and that the ME Department had voted against her.

On September 13, 2005, a new Dean of the College of Engineering, Dr. Mark Kushner, wrote to Provost Allen regarding the results of the College of Engineering's votes on remand.   Kushner also submitted his own recommendation against

Qamhiyah's promotion. As reasons for his recommendation, Kushner cited the number of "decidedly negative recommendations" against Qamhiyah, Qamhiyah's lack of national significance, weaknesses in her external opinion letters, weaknesses in her research, and her insufficient fundraising levels.

### 2. Qamhiyah's University Review on Remand

Following its second college-level review, Qamhiyah's case proceeded again to the university level for reviews by the Provost and ISU President. On October 11, 2005, Provost Allen sent Qamhiyah a letter expressing that he had again reviewed all of Qamhiyah's materials and would again recommend against her promotion because Qamhiyah "[had] not met [ISU's] standards for promotion and tenure." On November 8, 2005, President Geoffroy then wrote to Qamhiyah stating that he had "carefully reviewed [her] dossier after remand" and agreed with the recommendations not to promote her. President Geoffroy stated that he would inform the Board of Regents of his recommendation and that, unless Qamhiyah heard otherwise, her appointment would terminate on December 31, 2005. The Board of Regents ultimately chose not to promote Qamhiyah.

### F. Qamhiyah's Lawsuit

In April 2006, Qamhiyah sued ISU and the Board of Regents in federal court for employment discrimination. Qamhiyah claimed that she was denied tenure due to her national origin, religion, gender, and pregnancies, in violation of both state and federal law. ISU and the Board of Regents moved for summary judgment. Qamhiyah only resisted summary judgment for her federal-law claims.[5] After holding a hearing on the matter, the district court applied the burden-shifting framework of McDonnell

_____

[5] Qamhiyah conceded that the Eleventh Amendment to the U.S. Constitution barred damages for her state-law claims.

Douglas Corp. v. Green, 411 U.S. 792 (1973), to Qamhiyah's claims and granted summary judgment in favor of ISU and the Board of Regents on all counts.

## II.

"We review the district court's grant of summary judgment de novo and view the evidence in the light most favorable to the nonmoving party." Bearden v. Int'l Paper Co., 529 F.3d 828, 831 (8th Cir. 2008). "Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to a judgment as a matter of law." Id. (citing Fed. R. Civ. P. 56(c)). "We may affirm summary judgment for any reason supported by the record, even if it differs from the rationale of the district court." McGinnis v. Union Pac. R.R., 496 F.3d 868, 873 (8th Cir. 2007) (quotation omitted). In Brousard-Norcross v. Augustana College Ass'n, 935 F.2d 974 (8th Cir. 1991), we also stated:

> Our review of a tenure decision is approached with trepidation; a grant of tenure is a significant decision for a college and one that is not made lightly. We do not profess to possess the expertise required to evaluate such decisions for their merit. While Title VII unquestionably applies to tenure decisions, judicial review of such decisions is limited to whether the tenure decision was based on a prohibited factor.

Brousard-Norcross, 935 F.2d at 975–76.

Qamhiyah argues on appeal that the district court erred in granting summary judgment because she presented direct evidence of her discrimination claims. Alternatively, she argues that summary judgment was inappropriate under McDonnell Douglas. See McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860 (8th Cir. 2009) ("In this circuit . . . an employee may survive an employer's motion for summary judgment in one of two ways. The employee may produce direct evidence

of discrimination . . . . [or] show[] a genuine dispute for trial under . . . McDonnell Douglas." (internal citations and quotations omitted)).

### A. Qamhiyah's Direct Evidence Argument

Qamhiyah first argues that summary judgment was inappropriate because she presented direct evidence that national-origin, religious, gender, and pregnancy discrimination affected the decision to deny her tenure. Specifically, Qamhiyah cites to evidence related to actions by ME Department faculty members, an interview from the Ad Hoc Committee's investigation indicating that her pregnancies may have been referenced in a College Committee meeting, a statement in an external letter referencing her pregnancies, and a 2003 ISU study discussing a university-wide problem with the recruitment and retention of women and minority faculty members.

Qamhiyah, however, undisputedly presents no evidence related to the Board of Regents, the final decisionmaker in her case. She nevertheless argues that discrimination in the lower levels of her review tainted the entire tenure-review process such that the Board of Regents's final decision was biased. This argument invokes a "cat's paw" theory of liability.

"In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006). Pursuant to this theory, we have stated that "an employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003) (emphasis omitted).

"This circuit's 'cat's paw' rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006) (quotation omitted). Although we have yet to define the precise level of control biased subordinates must exert over decisionmakers before we will attribute liability to employers, see BCI, 450 F.3d at 486 (noting that courts are divided "as to the level of control a biased subordinate must exert over the employment decision" before employers may be liable under a cat's paw theory), an application of our prior case law sufficiently resolves the rule's application here.

In Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316 (8th Cir. 1994), an employee sued her employer for gender discrimination after being terminated. The employee had argued before the district court that she had presented direct evidence of her claim by demonstrating that her immediate supervisor had discriminated against her. Id. at 1323. The district court rejected the employee's argument, however, because the immediate supervisor had not made the final decision to terminate the employee, and "there was no credible evidence that [the actual decisionmaker] was biased." Id. Though we did not reference the "cat's paw" rule by name, we applied it in substance by reversing the district court on appeal. Id. We stated that "an employer cannot escape responsibility for discrimination[] when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of women." Id. (quotations and alterations omitted). We also stated that, where the immediate supervisor was "closely involved in the decision-making process at each step," it was "of little consequence" that the immediate supervisor did not "pull the trigger." Id. (quotation omitted)

In Lacks v. Ferguesn Reorganized School District R-2, 147 F.3d 718 (8th Cir. 1998), we specifically addressed the cat's paw rule where a high school teacher sued

her school for race discrimination after being terminated. The teacher had argued at trial that statements by her principal and an assistant superintendent constituted direct evidence of her claims. Id. at 724–25. A jury found for the teacher, but we reversed on appeal. Id. We held as a matter of law that the teacher's claim failed because the decision to terminate her belonged to the school board and there was "no evidence that the school board deferred to the opinion or judgment of [the principal or superintendent] in making its determination." Id. at 725. Instead, the evidence showed that the principal and assistant superintendent made no recommendations to the school board, that the principal and assistant superintendent were not present when the board made its decision, and that, ultimately, "the board made an independent determination as to whether [the teacher] should [have been] terminated and did not serve merely as a conduit for the desires of school administrators." Id.

In Kramer v. Logan County School District No. R-1, 157 F.3d 620 (8th Cir. 1998), we again addressed the cat's paw rule where a high school teacher sued her school for retaliation after the school board had voted not to renew her contract. Though the teacher presented no evidence that the school board had acted with discriminatory animus, she did present evidence that her principal and superintendent had engaged in discriminatory conduct toward her, had initiated the action that led to the non-renewal of her contract, and had "made material misrepresentations and omissions in presenting their recommendation to the board." Id. at 624. The district court rejected the school's motion for a judgment as a matter of law, and a jury found for the teacher. Id. at 622–23.

On appeal, the school "argue[d] that the district court erred in denying its motion for judgment as a matter of law." Id. at 623. The school claimed that it could not be liable because the school board had been the ultimate decisionmaker in the case and there was "no evidence that the school board engaged in intentional gender discrimination." Id. at 624. The school also argued that it could not be liable because the board had "conducted an independent fact-finding hearing" and had not merely

adopted the principal's and superintendent's recommendations. Id. We affirmed the district court and held:

> The question of whether the school board accurately accessed [the teacher's] situation or performed a perfunctory review and "rubber stamped" the recommendation to non-renew was appropriately presented to the jury. Assuming the facts as alleged by [the teacher] were proven, giving her the benefit of all reasonable inferences, and resolving all conflicts in the evidence in her favor, we cannot say that it was unreasonable for the jury to conclude that the non-renewal of her full-time teacher's contract was the result of intentional gender discrimination.

Id. at 624–25.

Judge Richard S. Arnold, who had authored Lacks, concurred in Kramer and distinguished Kramer from Lacks. Id. at 626–27. He stated that, unlike Lacks, the circumstances in Kramer would never have occurred but for the actions of the principal and superintendent that created the school board's review of the teacher's contract. Id. at 626. He also stated that Lacks was a fact-specific case and that the evidence in Lacks made the jury's verdict "wholly unreasonable." Id. at 627. Finally, Judge Arnold stated that Lacks "does not erect any general rule that a fair hearing before an impartial board immunizes a school district from the consequences of discrimination on the part of the district's administration, if that discrimination is the proximate cause of adverse employment action." Id.

In Dedmon, 315 F.3d 948, we again addressed the cat's paw rule, this time in a case where a terminated county employee sued a county clerk for retaliation. Though the county clerk had made the decision to terminate the employee, the employee attempted to prove her case by arguing that the clerk had served as the cat's paw for an immediate supervisor who had discriminated against her. Id. at 949. At trial, the district court rejected the employee's proffered cat's paw jury instruction,

and a jury found for the county clerk. Id. We affirmed the district court on appeal because we held that there was insufficient evidence to support the employee's proffered cat's paw instruction. Id. at 950. Specifically, we noted that there was no evidence that the immediate supervisor had "initiated, exercised, or even possessed any influence or leverage over [the county clerk's] decision to terminate [the employee]" or evidence that the immediate supervisor actually "harbored any unlawful animus toward [the employee] and sought to get her fired." Id. Thus, we held that the district court did not abuse its discretion in rejecting the proffered cat's paw instruction where there was a "dearth of evidence supporting the [employee's] propositions that [the supervisor] had an unlawful motive to have [the employee] terminated and wielded influence or leverage over [the county clerk]." Id. at 951.

Finally, in Richardson, 448 F.3d 1046, we addressed the cat's paw rule where a basketball coach sued a state university for race discrimination after the university fired him. There, the university president had the final authority to terminate the coach, and the coach attempted to prove his claim during a bench trial by offering evidence related to discriminatory behavior by the athletic director. Id. at 1060. The district court found for the university, and the coach argued on appeal that the district court had erred by failing to apply a cat's paw analysis to his claim. Id. at 1050, 1059. Putting aside the fact that the coach had failed to raise a cat's paw argument before the district court, id. at 1059, we stated that the evidence foreclosed the coach's cat's paw argument because the coach's contract provided for the university president to independently review any decision to terminate him, the president amply undertook that review, and the president independently determined that there was a sufficient basis to fire the coach. Id. at 1060. Thus, we concluded that the university president, "who had the final say on [the coach's] termination, was not used as a cat's paw to carry out someone else's alleged discriminatory motive." Id.

Applying these cases, it is evident that Qamhiyah's cat's paw argument cannot rescue her direct evidence claim because, even assuming discrimination existed at the

lower-levels of her review, there is simply no evidence that the Board of Regents "serve[d] as the conduit, vehicle, or rubber stamp by which another achieve[d] his or her unlawful design."

As extensively outlined above, Qamhiyah's tenure-review case received a vigorous and thorough review. It included, in some form, approximately eighteen different assessments involving dozens of faculty members and administrators. According to undisputed portions of the record, evaluators at almost every level of review criticized Qamhiyah's scholarship, fundraising, and publishing records, and they overwhelmingly agreed that Qamhiyah did not satisfy ISU's standards for tenure. Though we recognize that there is evidence that upper-level reviewers did consider lower-level recommendations when evaluating Qamhiyah's case, the evidence nonetheless shows that the upper-level reviews were independent and that many of the reviews took place after Qamhiyah had voiced her concerns regarding prior votes. Moreover, there is simply no evidence indicating that these later reviews relied on filtered facts or material misrepresentations from others with alleged discriminatory motives. To the contrary, the record clearly shows that each level in the process received Qamhiyah's credentials for review and that, in the later stages of the process, Qamhiyah undisputedly received multiple opportunities to defend her record and respond to earlier criticisms.

Provost Allen's university-level reviews in particular compel us to reach this conclusion. It is undisputed that Allen reviewed Qamhiyah's tenure application three times[6] before the Board of Regents made a final ruling on Qamhiyah's case. In doing so, Allen met with Qamhiyah personally to allow her to voice her concerns, and the record demonstrates—and Qamhiyah does not contest—that Allen considered Qamhiyah's concerns when reevaluating her application. Nevertheless, Allen

---

[6] This does not include Provost Allen's independent review of Qamhiyah's administrative appeal.

consistently found Qamhiyah unqualified for promotion, and there is simply no evidence indicating that bias or the influence of bias affected his conclusions. Indeed, there is no evidence suggesting that anyone wielded any influence over Allen or tampered with his decisions, that anyone with discriminatory intent participated in or was present during his reviews, that Allen himself acted with discriminatory animus, that Allen relied on a filtered or misrepresented record, or that Allen did anything less than perform thorough, independent reviews of Qamhiyah's case. Thus, even assuming discrimination existed in the early stages of the tenure-review process, the record, even when viewed in Qamhiyah's favor, demonstrates that Allen's extensive reviews prevented any such discrimination from influencing the Board of Regents's final decision. For these reasons, we reject Qamhiyah's claim that she presents direct evidence of discrimination.

### B. Qamhiyah's McDonnell Douglas Argument

Qamhiyah alternatively argues that summary judgment was inappropriate under McDonnell Douglas. Absent direct evidence, an employment-discrimination plaintiff "may survive a motion for summary judgment . . . under the burden-shifting analysis of [McDonnell Douglas]." Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1127 (8th Cir. 2008) (quotation omitted). "Under this framework, a Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination." Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006) (internal quotation omitted). "If a prima facie case is established, a burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for [its action]." Id. (quotation omitted). "If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." Id. at 935 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515–16 (1993)).

ISU and the Board of Regents do not contest the district court's finding that Qamhiyah established a prima facie case for her national-origin, religion, and pregnancy discrimination claims. We also assume without deciding that Qamhiyah correctly argues that she established a prima facie case for her gender-discrimination claim. Thus, we proceed directly to the second step of McDonnell Douglas.

ISU and the Board of Regents assert that the Board of Regents denied Qamhiyah tenure because she was not qualified. They claim that Qamhiyah's scholarship was unworthy of promotion, that she failed to secure adequate external funding, and that she lacked sufficient publications to meet ISU's standards for tenure. Given that a defendant's burden of production is "non-onerous," Montes v. Greater Twin Cities Youth Symphonies, 540 F.3d 852, 858 (8th Cir. 2008), the record supports ISU and the Board of Regents's reasoning as legitimate grounds to deny Qamhiyah tenure. Qamhiyah's Position Responsibility Statement required her to produce scholarship, raise external funds, and publish. It is also undisputed that committees and administrators consistently criticized Qamhiyah's application in these regards throughout the tenure-review process and also raised concerns about these issues during her time at ISU. Thus, we proceed to the final step of McDonnell Douglas.

Qamhiyah argues that ISU and the Board of Regents's grounds for denying her tenure are pretextual because there were procedural irregularities in the voting process and shifting reasons for the decision. Qamhiyah also argues that, in comparison to other candidates, her credentials were sufficient to justify promotion.

Regarding Qamhiyah's procedural-irregularity argument, we note that "departures from procedural regularity can raise a question as to the good faith of the tenure decision process." Brousard-Norcross, 935 F.2d at 977 (quotation and alterations omitted). We do not believe, however, that Qamhiyah offers evidence of "deviation[s] from the procedural norm[s] sufficient to view [ISU and the Board of

Regents's] reasons for tenure denial as pretextual." Id. To the contrary, the record shows that ISU and the Board of Regents accorded Qamhiyah significant review consistent with ISU's written policies. While the process was not flawless, Qamhiyah was given substantial opportunity to present her application for tenure, to address criticisms and concerns, and to cure any perceived irregularities through ISU's appeal process. The Board of Regents, in fact, went so far as to remand Qamhiyah's case for further review, and Qamhiyah asserts no claims that the majority of her reviews, including her review by the Board of Regents or the reviews that took place upon remand, varied from ISU's standard policies. Moreover, the alleged procedural irregularities do nothing to demonstrate that the legitimate reasons for denying Qamhiyah tenure were pretextual. Thus, we agree with the district court's conclusion that, "considered in the context of the collective and multi-layered decision involved, the procedural irregularities argued by Dr. Qamhiyah do not reasonably support a finding of pretext."

We also reject Qamhiyah's argument that ISU and the Board of Regents have offered shifting reasons for denying Qamhiyah tenure. While "[p]retext may be shown with evidence that the employer's reason for the termination has changed substantially over time," McCullough, 559 F.3d at 863, the record in this case was consistent. As outlined above, the undisputed evidence clearly demonstrates that nearly every committee or administrator who evaluated Qamhiyah's case found Qamhiyah unqualified for tenure, almost uniformly citing weaknesses in her scholarship, fundraising, and publishing as reasons for that conclusion. Thus, we believe that there were insufficient inconsistencies and contradictions to raise a factual dispute as to this argument. Id.; see also Brousard-Norcross, 935 F.2d at 977.

Finally, regarding Qamhiyah's claim that her credentials qualified her for tenure, we have held that, to prevail in the academic context, a plaintiff asserting employment discrimination "must show something more than a mere dispute over her qualifications for the position." Kobrin v. Univ. of Minn., 121 F.3d 408, 414 (8th Cir.

1997) (quotation omitted).  Rather, "in the tenure context . . . the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported."  Id. (quotation omitted); see also Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 643 (8th Cir. 2008) ("The showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee.  A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." (internal citation, alteration, and quotations omitted)); Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 283 (3d Cir. 2001) (noting in a case where a professor had sued her college for employment discrimination that "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus").

Here, even viewing the record in Qamhiyah's favor, the decision to deny Qamhiyah tenure was not "obviously unsupported."  Kobrin, 121 F.3d at 414 (quotation omitted).  The record extensively demonstrates that Qamhiyah had a history of struggling in areas of scholarship, fundraising, and publishing throughout her time at ISU and that dozens in the academic universe found Qamhiyah's credentials weak.  "[W]e accord a high degree of deference to the judgment of university decision-makers regarding candidates' qualifications for academic positions."  Id. (internal quotation omitted); see also  Okruhlik v. Univ. of Ark., 395 F.3d 872, 879 (8th Cir. 2005) ("The Supreme Court has made it clear that '[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment.'" (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985))).  Moreover, as to the sufficiency of Qamhiyah's fundraising and publishing, which the parties hotly dispute, "[i]t is not for us to determine what constitutes a sufficient amount of [fundraising or publishing] before a denial of tenure is justified; we will not sit as a 'super personnel council' to review tenure decisions."  Brousard-Norcross, 935 F.2d at 976 (discussing

the sufficiency of negative student feedback to deny tenure).  For these reasons, we reject Qamhiyah's pretext arguments and affirm the district court's decision under McDonnell Douglas.

III.

For the foregoing reasons, we affirm the judgment of the district court.

COLLOTON, Circuit Judge, concurring in the judgment.

I would affirm the judgment for the reasons stated by the district court in its thorough 53-page opinion. *Qamhiyah v. Iowa State University*, No. 4:06-cv-00187, R. Doc. 50, Ruling on Defendants' Motion for Summary Judgment  (June 27, 2008). I therefore find it unnecessary to "assum[e] that discrimination existed at lower-levels of [Qamhiyah's] review," *ante*, at 20, and to address what would be difficult issues of causation raised by that assumption on this record.  *See* J.A. 304 (letter of Provost Allen, accepting reasons for decision given by Dr. Vance and Dean Kushner), Appellant's Br. 18-19 (alleging direct evidence of discriminatory motive of Dr. Vance); J.A. 229 (memorandum from Dean Kushner giving as a "main reason" for denial of tenure that a "compelling justification" should be required to reverse the recommendations of the department chair and lower-level review committees).  *Cf. Okruhlik v. Univ. of Arkansas*, 395 F.3d 872, 880 (8th Cir. 2005) (stating in *dicta* that a jury in a tenure case "may reasonably conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision") (internal quotation omitted).

_____