# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1472

_____

James Rafael Diaz      \*

       \*

       Plaintiff-Appellant.      \*

       \*    Appeal from the United States

       v.      \*    District Court for the Southern

       \*    District of Iowa.

Tyson Fresh Meats, Inc.,      \*

       \*

       Defendant-Appellee.      \*

_____

Submitted: December 16, 2010
Filed: June 28, 2011

_____

Before LOKEN and BYE, Circuit Judges, and MARSHALL,[*] District Judge

_____

MARSHALL, District Judge.

       The question is whether this Iowa-law case alleging disability retaliation was for the jury to decide. The District Court[**] granted summary judgment for Tyson Fresh Meats, Inc. James Diaz appeals. He made many federal and state

---

[*]The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

[**]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

discrimination claims in the District Court, but all have dropped out except one: he contends Tyson retaliated against him for seeking accommodation for a disabled subordinate contrary to the Iowa Civil Rights Act. We review *de novo*, considering the genuinely disputed facts in the light most favorable to Diaz. *Torgerson v. City of Rochester,* No. 09-1131, 2011 WL 2135636, at \*7 (8th Cir. 1 June 2011). Diaz presses a "cat's paw" theory. A jury should decide, Diaz says, whether an intermediate supervisor's retaliatory animus was a proximate cause of the plant manager's decision to fire Diaz. *Qamhiyah v. Iowa State University of Science and Technology,* 566 F.3d 733, 742–45 (8th Cir. 2009); *see also Staub v. Proctor Hospital,* 131 S. Ct. 1186, 1190 (2011).

**1.** Diaz supervised about forty-five people at a Tyson hog-processing plant in Iowa. He had worked at the plant for about fifteen years, starting on the production line and rising to a supervisor on the cut floor. The teams on the floor had chronic problems with under staffing. When Javier Gonzalez hurt his shoulder handling hogs on the line, Diaz took him to the plant nurse. Gonzalez was placed on a one-week 50% restriction—he had to split his job with someone else, or work only thirty minutes of every hour. For the first few days Diaz honored this restriction. Then, because of the press of work and no new help, Diaz had Gonzalez take only a fifteen minute break every hour. Diaz says he shortened Gonzalez's breaks at the direction of Tom Hanson, Diaz's supervisor, because other workers were not available. Hanson denied ordering or blessing this arrangement, but he did know about Gonzalez's work restriction. Because of the ongoing staffing problems, Diaz and others had often asked Hanson for more help. As to Gonzalez's hurt shoulder, Diaz asked Hanson for help at least twice. None came.

When Gonzalez went back to the plant nurse for his one-week check up, his shoulder was hurting again. And Gonzalez explained that his 50% restriction was not being followed. The human resources office, and eventually the plant manager, John McNamara, investigated. McNamara faced conflicting stories from Diaz and Hanson

about who had decided how much Gonzalez would work. McNamara decided to fire Diaz because it was undisputed that he knew Gonzalez's work restriction and failed to honor it. McNamara testified on deposition that, if Hanson was the one responsible for making Gonzalez work beyond his restriction, then Hanson—not Diaz—probably would have lost his job.

**2.** The Iowa Civil Rights Act forbids retaliation against anyone who opposes disability-based employment discrimination or who obeys the Act. IOWA CODE §§ 216.6 & 216.11. We analyze Diaz's retaliation claim like an ADA-retaliation claim because an Iowa court would do so. *Young-Losee v. Graphic Packaging Int'l, Inc.,* 631 F.3d 909, 911–12 (8th Cir. 2011); *Fuller v. Iowa Dep't of Human Services,* 576 N.W.2d 324, 329 (Iowa 1998).

In the usual retaliation claim under the Act, the familiar *McDonnell Douglas* framework applies. The plaintiff must make a *prima facie* case by showing protected activity, adverse employment action, and causal linkage. *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1048 (8th Cir. 2005). Then the employer must offer a legitimate, non-discriminatory explanation; and plaintiff must demonstrate in the end that this explanation is a pretext for discrimination. *Ibid.* The District Court evaluated Diaz's case in this framework. The parties argue the appeal the same way, but with caveats: Diaz does not address pretext, implying that his cat's paw theory eliminates the need to do so; Tyson notes the uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability.

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. *See Shager v. Upjohn Co.,* 913 F.2d 398, 405 (CA 7). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing.

*Staub,* 131 S. Ct. at 1190 n.1. This Court has addressed the cat's paw theory a number of times. *Qamhiyah,* 566 F.3d 733, 742–45 (summarizing the cases). It describes "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Qamhiyah*, 566 F.3d at 742 (quotation and citation omitted).

According to Diaz, Hanson was the biased subordinate and McNamara the duped decisionmaker. There is, as Tyson notes, some tension in Diaz's argument. Our cat's paw cases involve what our Court calls direct-evidence claims, *e.g., Qamhiyah,* 566 F.3d at 742; *Richardson v. Sugg,* 448 F.3d 1046, 1059–60 (8th Cir. 2006), not claims pursued through the *McDonell Douglas* burden-shifting framework. Indeed, the theory is premised on a biased subordinate—the monkey who effects his discriminatory intentions through the unbiased cat's paw. Consider the situation in the Supreme Court's recent *Staub* case. A reasonable fact-finder could conclude that Staub's co-workers' hostility to his Army Reserve service was a proximate cause of his firing. 131 S. Ct. at 1193–94. We need not, however, resolve the doctrinal tension in Diaz's case because his cat's paw theory fails on its own terms.

**3.** Was there, on the record as a whole, a genuine dispute for trial on whether Hanson's retaliatory animus was a proximate cause of Diaz's firing? Guided by our cat's paw precedents and *Staub*, we think not. First, the proof fails on discriminatory intent. Hanson ignored Diaz's repeated requests for help accommodating the injured employee's work restriction; he instructed Diaz not to honor the restriction; and he let Diaz take the fall when the policy violation came to light. But these facts do not establish, or tend to establish, Hanson's intent to get Diaz fired in retaliation for Diaz's repeated requests to accommodate the injured worker. On deposition, Diaz confirmed Hanson's motivation: Hanson lied to protect himself, nothing else.

Q. Did you feel that Mr. Hanson lied with regard to the Javier Gonzale[z] situation?
A. Yes.
Q. Did you think that Mr. Hanson lied to try to protect himself?
A. Yes.
Q. Can you think of any other reason that Mr. Hanson would have lied?

***

Q. Beyond trying to protect himself?

***

A. No.

Joint Appendix at 40.

Second, the proof fails on causation. Hanson did not report Diaz's violation of the work restriction. He did not recommend that Diaz be disciplined. McNamara did not rely on Hanson's story in deciding to fire Diaz. Hanson's general and long-standing hostility to providing extra help to any supervisor anytime is certainly somewhere in the chain of causation leading to Diaz's firing. It is simply too far removed from Diaz's particular request for help in Gonzalez's place, however, to create a jury question on disability retaliation in this case. *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754–55 (7th Cir. 2011) (Posner, J.).

Third, even if Hanson set Diaz up for discipline in retaliation for trying to obey the Act by accommodating the injured worker, the plant manager's decision was untainted. *Richardson*, 448 F.3d at 1059–60; *Lacks v. Ferguson Reorganized School District R-2*, 147 F.3d 718, 725 (8th Cir. 1998). *Staub* teaches that an independent review by the ultimate decisionmaker does not necessarily resolve the causation issue in the employer's favor. 131 S. Ct. at 1193. But it is undisputed here that McNamara put the Hanson/Diaz swearing match to one side and decided to fire Diaz based solely on Diaz's admitted violation of established company policy requiring that work restrictions be honored. As we recently said, a plaintiff "cannot establish a causal link

between the alleged discriminatory animus and the" adverse employment action if the same result would have occurred regardless of the animus. *E.E.O.C. v. Con-Way Freight, Inc.,* 622 F.3d 933, 936 (8th Cir. 2010). An employer's insistence on scrupulously honoring work restrictions protects injured workers and makes good business sense. That McNamara probably would have fired Hanson (not Diaz) if McNamara had resolved who really made the decision to overwork Gonzalez does not create a jury issue on causation. This is a back door into the correctness of Tyson's personnel decision, when the dispositive legal issue is whether Hanson's retaliatory animus motivated McNamara to fire Diaz. No reasonable fact-finder could conclude that it did.

Affirmed.

_____