# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1142

_____

Nidal Othman,

        Appellant,

v.

City of Country Club Hills,

        Appellee.

\*
\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Eastern District of Missouri.
\*
\*
\*

_____

Submitted:  December 15, 2011
Filed:  March 1, 2012

_____

Before WOLLMAN, COLLOTON, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The City of Country Club Hills (the City) did not hire part-time police officer Nidal Othman for full-time positions that became available in April and October 2008.  Othman, who was born in Jordan, later filed suit, alleging that the City discriminated against him based on his national origin, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.  The magistrate judge[1] granted summary judgment in favor of the City.  We affirm.

_____

[1]The Honorable Mary Ann L. Medler, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was submitted by consent of the parties pursuant to 28 U.S.C. § 636.

I.

In January 2008, Othman applied for a police officer position with the City. His application indicated that he was born in Amman, Jordan, and that he had attended school there.

Captain Michael Adler conducted a background investigation of Othman and wrote a report on his findings. The report disclosed that Othman was born and raised in Jordan and that he had become a citizen of the United States in 2002. In the summary, Adler indicated that Othman would proceed in the application process, taking a written test and later interviewing with the chief of police and the police commissioners board. Police Chief Clifton Ware interviewed Othman, reviewed the background investigation report, and recommended to the mayor and the board of aldermen that Othman be hired. The board followed the recommendation, and Othman began working as a part-time police officer in February 2008.

At that time, Othman owned two gas stations. Othman testified that he told Ware that he would prefer to work the morning or afternoon shift, but that he was available to work the night shift if necessary.

In March 2008, a citizen complained to Adler and a police lieutenant about Othman. According to Adler's report, the citizen alleged that Othman completed a U-turn to initiate a traffic stop and that Othman had called the citizen a "lying weasel." J.A. 40. Othman admitted to both the U-turn and the name calling. He was admonished to remain professional. The report "strongly suggested that P.O. Othman be closely monitored as red flags are starting to emerge." Id. 42.

In April 2008, a full-time officer position became available. Othman testified that he told Ware that he was interested in the full-time position. Ware, however,

recommended officer Jimmy Qualls for the position. Qualls was then a part-time officer who had been hired a month after Othman. Ware believed that Qualls had more experience and had demonstrated better performance than Othman. He also believed that Othman was unable to work rotating shifts due to the demands of his gas station business. According to Ware, full-time officers must be able to work rotating shifts.

Othman traveled to Jordan from May 10, 2008, to June 10, 2008, and from July 29, 2008, to September 4, 2008. Ware granted his leave requests, and Othman testified that no one from the City gave him a "hard time" about his travels. J.A. 106. Othman testified that after he returned, Adler began making comments about Hezbollah and asked Othman if he was sending money overseas. Othman testified that Adler would say things like, "Do you know Osama Bin Laden? Do you know where he's at?" Id. 78. Othman further testified that Adler told him repeatedly, "[t]hat's not how we do it in the U.S." Id. 78. In an affidavit, Officer Kevin Burgdorf stated that Adler said that Othman was part of "Jihad" and that Othman was "probably working for them in the Middle East." Id. 195-96. Othman and Burgdorf complained to Ware about Adler's comments.

A second full-time position became available in October 2008. Othman submitted a written memorandum to Ware, stating that he would like to be considered for the position. Othman testified that he had told Ware that he was available for all shifts, but that he preferred the morning or afternoon shift. According to Ware, Othman indicated that he was unable to work the rotating schedule. Ware decided to exclude Othman from consideration. Laquitta Cleveland, an officer from outside the department with more than six years' experience, was hired to fill the position. The record does not indicate the extent of Adler's involvement in the April or October 2008 hirings. In January 2009, Othman resigned from his position. He later filed suit.

-3-

Ware testified that Adler assisted in hiring police officers. Adler conducted background investigations and provided recommendations to the chief, who would usually accept Adler's recommendations. Ware testified, "I would review all the material from whatever the circumstance happened to be along with [Adler's] recommendation or his findings in . . . any particular investigation, and then I'd come to a conclusion of my own." J.A. 135. When asked whether Ware gave significant weight to Adler's findings, the chief responded, "Yes." Id. There is no evidence in the record that explains Adler's role in the City's decision to hire Qualls and Cleveland.

Othman did not believe that Ware harbored discriminatory animus against him. According to Othman, Ware "never told me anything about my national origin. . . . I don't think he's that type of guy." J.A. 100. Ware also stated that Othman's national origin was not a factor in his hiring decisions.

II.

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Othman alleges that the City discriminated against him based on his national origin. Title VII provides that it is an unlawful employment practice for an employer to fail or refuse to hire any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Othman may avoid

summary judgment by presenting direct evidence of discrimination or by relying on indirect proof of discrimination and "creating the requisite inference of unlawful discrimination through the McDonnell Douglas analysis, including sufficient evidence of pretext." Torgerson, 643 F.3d at 1044.

A.

Othman argues that the magistrate judge's order was flawed because it applied only the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Othman contends that he presented direct evidence that an illegitimate motive had infected the City's decision to forego hiring him for a full-time officer position. See Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989) (O'Connor, J., concurring in judgment); Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Direct evidence of discrimination "is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Torgerson, 643 F.3d at 1044 (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "Stray remarks," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process" do not constitute direct evidence. Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring in judgment).

Othman contends that the district court failed to consider whether Adler was part of the decisionmaking process. If it had, Othman argues, it would have determined that Adler was a decisionmaker because Ware accepted Adler's recommendations when hiring and disciplining officers. Othman further contends that Adler's statement—"that's not how we do it in the U.S."—constitutes direct evidence of discriminatory intent. He argues that "[t]his statement constitutes the specific link between the discriminatory animus shown by the multitude of comments

-5-

made with respect to Othman's national origin and the challenged decision not to hire him for a full time position." Appellant's Br. 11.

Othman, however, has failed to establish that Adler was a decisionmaker and thus has not presented direct evidence of discrimination. Ware's affidavit states that it was he who made the decisions (1) "to pass Officer Qualls' name to the Board of Aldermen for hire instead of Officer Othman's" and (2) "to exclude Othman from consideration for the opening that developed in the fall of 2008." J.A. 33, 34. As set forth more fully below, there is no genuine dispute of material fact that Ware, who harbored no discriminatory animus, was the one who decided to not hire Othman for the full-time positions.

Othman argues that "the Chief of Police rarely deviated from adopting all of Adler's recommendations" and that Ware "rubber stamp[ed] Adler's wishes into force and effect." Appellant's Br. 23, 5. But there is no evidence that Adler recommended that Qualls or Cleveland be hired or that Adler had any influence on Ware's decision to exclude Othman from consideration for the October 2008 opening. Ware's deposition testimony describes the role Adler typically played in hiring officers. Ware testified that Adler "was also part of the hiring process . . . [a]s an interviewer, as a background investigator—pre-employment background investigator." J.A. 135.

> Q: And in regards to those investigations, would he provide recommendations?
> A: Yes.
> . . .
> Q: And in working with him, would you usually go along with his recommendations in regards to hiring?
> A: Yes.

Id. The only example of Adler's involvement in the hiring process is Othman's background investigation report, wherein Adler recommended that Othman advance

to further testing and interviews. Othman testified that he did not meet Adler until he began working for the City. A fair inference from this record is that after Adler completed the background investigation, candidates were required to take a written test and participate in an interview before Ware decided whether to recommend the candidate to the board. Adler's recommendation that a candidate proceed in the hiring process does not equate to making the hiring decision. Given the paucity of evidence regarding Adler's role in the decisions to hire Qualls or Cleveland and the record evidence regarding Adler's typical role in the hiring process and his role in hiring Othman, the record does not support the inference that any animus on Adler's part influenced Ware's decision to not hire Othman for the full-time positions that became available in April and October 2008.

Othman contends that even if Adler was not a decisionmaker, his case should survive summary judgment under the cat's paw theory of employer liability. The term cat's paw refers to "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah v. Iowa State Univ. of Science & Tech., 566 F.3d 733, 742 (8th Cir. 2009) (quotation and citation omitted). "Animus and responsibility for the adverse action can both be attributed to the earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1192 (2011); see also Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1151-52 (8th Cir. 2011). For the same reasons as those set forth above, the record fails to support an inference that Adler's discriminatory animus was a proximate cause of Ware's decision to forego hiring Othman for a full-time position.

B.

Othman's final argument is that he produced sufficient indirect evidence to survive summary judgment under the McDonnell Douglas burden-shifting analysis.

Under this framework, Othman must first establish a prima facie case of discrimination based upon his national origin. Torgerson, 643 F.3d at 1046. To do so, Othman must show that he is in a protected class, that he was qualified for an open position, that he was denied that position, and that the employer filled the position with a person not in the same protected class. Id. The burden then shifts to the City to articulate a legitimate, nondiscriminatory reason for not hiring him. Id. Once the City proffers such a reason, the burden then shifts back to Othman to show that "the legitimate reasons offered by [the City] were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quotations and citation omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (quotations and citation omitted).

Othman has set forth a prima facie case of discrimination, and the City has articulated legitimate, nondiscriminatory reasons for not hiring Othman. According to Ware, he decided to recommend Qualls for the April 2008 full-time position because he thought Qualls was a better candidate with more experience, there had been a citizen complaint against Othman, and he believed that Othman was unable to work rotating shifts. Ware stated that he decided to exclude Othman from consideration for the October 2008 position for similar reasons. Othman claims that Ware's reasons were false. A plaintiff may show that the employer's stated reason is pretext for discrimination by showing "that the employer's explanation is 'unworthy of credence because it has no basis in fact.'" Torgerson, 643 F.3d at 1047 (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)) (alterations omitted).

Othman first argues that the City's discriminatory animus is shown by the fact that he was better qualified for the full-time officer positions than Qualls or Cleveland. As evidence of his superior qualifications, Othman points to the facts that

he had been working for the City longer than Qualls, that he graduated from police academy earlier than Cleveland, and that he had experience in a narcotics and gang task force. For its part, the City presented evidence that Qualls and Cleveland had more police experience than Othman. Viewed in the light most favorable to Othman, the record reflects that all three officers were qualified for the full time positions. "Similar qualifications do not raise an inference of discrimination." Torgerson, 643 F.3d at 1049 (quotations and citation omitted). To support a finding of pretext, Othman was required to show that the City hired a less qualified candidate. See Kincaid v. City of Omaha, 378 F.3d 799, 805 (8th Cir. 2004). This he has failed to do.

Othman does not dispute that a citizen complained about this behavior to Adler and another officer. Rather, he notes that the complaint was informal, that it included allegations that he did not admit, and that he was not reprimanded. It is also undisputed that Othman advised Ware that he would prefer to not work the night shift, despite evidence of a need for full-time officers to work rotating shifts. Given this state of the record, Ware's explanation has some basis in fact and thus does not support an inference of pretext.

III.

The judgment is affirmed.

_____